**FILED**

AUG 11 2014

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TODD S. GLASSEY<br>305 McGaffigan Mill Road<br>Boulder Creek, California 95006<br><br>and<br><br>MICHAEL E. MCNEIL<br>PO Box 640<br>Felton, California 95018-0640<br>,<br><br>Plaintiffs,<br><br>vs.<br>Microsemi Inc<br>One Enterprise Aliso Viejo, CA 92656 USA,<br>and DOES 1...100;<br><br>Defendants | CASE NO.<br>JUDGE **CV 14 3629**<br><br><br>**COMPLAINT**<br><br>**Jury Demand Endorsed Herein** |

May it please the Court, for their Complaint, Plaintiffs Todd S. Glassey and

Michael E. McNeil state as follows:

1.    Plaintiffs are individuals who were, for all times relevant hereto, residents

of Santa Cruz County, California.

2.    Defendant Microsemi (**"Microseni"**) Inc is on information and belief, a

California based US Corporation.

3.     Defendant Symmetricom, Inc. ("**Symmetricom**"), was, on information and belief, a Delaware corporation with its principal place of business in Irvine California.

4.     Symmetricom did, on information and belief, acquire the assets and liabilities of Datum, Inc. ("**Datum**"), in 2002 through a Merger creating a new Symmetricom Corroboration as the successor to Datum.

5.     Defendant Digital Delivery Inc ("**DDI**") is a Massachusetts based corporation which  Plaintiffs retained for Patent Agency legal representation;

6.     Datum did, on information and belief, acquire the assets and liabilities of Digital Delivery, Inc. ("**DDI**") in or about July 1999.

7.     Microsemi is, on information and belief, the successor in interest for any liabilities of Symmetricom, Datum and DDI to Plaintiffs.

8.     The Internet Engineering Task Force ("IETF") is on information and belief,  a Global Standards Organization who has produced the majority of the network standards applications which infringe are written from. As a DOE this includes their management and membership;

## JURISDICTION AND VENUE

9.     This Court has original subject matter jurisdiction over this suit pursuant to 28 USC § 1338 because the matters in it relate to patents, International filing of patents and copyright infringements;

10.    This Court has subject matter jurisdiction over the remaining claims at issue in this suit pursuant to is supplemental jurisdiction as codified by 28 USC § 1367 because they form part of the same case and controversy as those claims relating to

2

patents and their infringement through licensing issued via copyright in Global Network Standards for the use of these intellectual properties.

11.     Further under Subject Matter Jurisdiction because this case uniquely involves both US and international Patents and asks the question as to whether Patent Protections in an issued Patent can be set aside by a copyrighted Network Technology Standard which uses that Intellectual Property without permission and authorize "any and all uses of it" without any legal standing to do so; an act which funtionally is being interpreted by the Industry as authorization for them to use these intellectual protocols without compensation on a global basis, as such this case meets all the requirements for hearing in the District Court;

12.     This Court has personal jurisdiction over this matter because the Plaintiffs reside in this judicial district and a substantial portion of the events below took place in this district.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to the claims at issue in this dispute occurred in this district.

## STATEMENT OF OPERATIVE FACTS

14.     This Complaint is being brought in the United States District Court because there are issues in dispute between the parties which require the Court to construe the claims of certain US Patents and copyrights issued against those patent

3

contents in technical products and applications for patents which confers exclusive jurisdiction for central components of this dispute to the federal judiciary.

15.     Prior to the filing of this Complaint in this Court, the Plaintiffs and Symmetricom were parties to a California Superior Court suit captioned *Michael E. McNeil, et al. v Book (Symmetricom) et al.*, which was dismissed without prejudice to any of the claims therein and proceeded as that Court's Case No. CV 165643 (the "State Court Lawsuit").

16.     This filing is the transfer of that lawsuit to the Federal Jurisdiction in full because the State Court Lawsuit could not continue to be prosecuted in California Superior Court because, as that case developed, it became apparent that the California Superior Court would be required to construe "US Patent and simultaneous copyright claims" which no Federal Court has ruled in yet, and perform this ruling against parties in a number of jurisdictions (*the IETF and its international members) to render any judgment on the claims for relief Plaintiffs brought, and that Court lacked the subject matter jurisdiction to do so.

17.     Further since the Federal Government is the signatory to the TRIPS agreement the international nature of the abandoned instances of US6370629 patents filed in Japan, Brazil, Canada, South Africa and the EU are only actionable under the TRIPS treaty in the US and only the US District Court has standing in an international treaty.

18.     Plaintiffs are computer scientists with expertise in the design, development, and implementation of timekeeping technologies for use in a variety of security, commerce, and communications systems with a special focus on digital evidence systems focusing on location and time infrastructure.

19.     Symmetricom, for itself and as successor in interest to Datum and DDI, is in the business of commercializing timekeeping technologies for use in various markets.

## Plaintiffs' Relationship with Datum

20.     In or about October 1997, Plaintiff Glassey approached Datum through Davey Briggs VP of Marketing for the Beverley Massachusetts division of Datum. The purpose of the conversation was to retain Datum to "manufacture a component of the time controls" for an email and document control gateway of Glassey's design. The design was called the Trusted Timing Infrastructure and creates a set of evidence-to-transaction models and the technology to implement them.

21.     Initially Datum said no to building the high-end components of the system but was very interested in the component level Trusted Local Clock Module as a potential mass-market addition to Datum's existing Board Level Timing Products so they referred him to the San Jose California division called BANCOM.

22.     At Bancom/Datumn Glassey interfaced initially with Mitch Stone the VP of Marketing; Glassey's request to Datum if he was right would open new end-user and OEM markets to Datum in the board level timing products area and to further to that Stone opened detailed market analysis discussion between Plaintiff Glassey and Datum, concerning whether Datum and Glassey might undertake broader business efforts together; To allow free and open discussion about Glassey's IP  Datum and Glassey entered into a mutual nondisclosure agreement in November 1997 (the "**Datum NDA**"). Mitch Stone processed that NDA.

23.     In the months following the execution of the Datum NDA, Glassey and Datum (through Mitch Stone as the principal point of contact) had a variety of

conversations and did a variety of industry analysis efforts to determine the total potential of the market sector for this time-stamping evidence system; this effort included two road trips on which Glassey and Datum VP of Marketing Mitch Stone ran the customer survey with exciting results.

24.    The next step was a meeting with the division presidents of all of Datum and a Board Meeting at a local trade show happening in Atlanta; to Attend the meeting Glassey was flown out to present the total of the potential to the Board and officers of the corporation for the Trusted Timing Infrastructure components he asked them to build for him.

25.    At this point Datum initiated aggressive discussions with Glassey about product design of their systems and how his infrastructure could be used to advance their existing BC635 GPS based timing card as a stand alone and clustered time service module.

26.    This excited Datum even further and Erik Van Der Kaay the President and CEO of all of Datum corporate umbrella called Glassey and told him the deal was on. He asked Glassey to both incorporate and bring in at least one more engineering member for his team and promised both guaranteed financing through a monthly payment process to let GMT just focus on the engineering as well as longer term reseller status.

27.    To meet that demand, in early 1998 Plaintiff Glassey was joined in his commercial efforts by Plaintiff McNeil in Glassey's new company known as GMT.

28.    To support Datum running Payroll for GMT on or about May 4, 1998, Plaintiffs each executed a consulting agreement with Datum for the purpose of securing certain technical consulting services (the "**Datum Consulting Agreements**"), true and correct copies of which are attached as Exhibits A and B hereto.

6

29. The Datum Consulting Agreements were effective from May 4, 1998, to July 4, 1998, and during that period Plaintiffs provided services to Datum exclusively relating to market analysis to support Datum's developing e-commerce division.

30. Upon the expiration of the Datum Consulting Agreements, Plaintiffs and Datum agreed to continue to work together without further written agreements with the understanding, based on the existing Datum NDA, that Plaintiffs would own any and all intellectual property developed by them or shared by them during the term of the continuing relationship and that Plaintiffs would be independent contractors for Datum.

31. Among the tasks Plaintiffs agreed to take on as independent contractors for Datum after July 4, 1998, were the identification of potential acquisition targets for Datum as it sought to expand its e-commerce business.

## Plaintiffs' Relationship With DDI

32. From approximately December 1997 onward, Plaintiffs worked to develop other relationships in the industry for the purpose of commercializing their time control technologies.

33. One of the companies that Plaintiffs developed a relationship with was Digital Delivery Inc ("DDI"). Glassey and DDI President Mark Hastings were talking about adding some timing controls to DDI's product suites and so then entered into a Non-Disclosure Agreement (Jun 1997) to further those discussions.

34. Later but under the NDA Glassey disclosed the scope and design of his GeoLocation Controls and Location Based Policy Services to Hastings as his new patent application; This conversation took place in the employee second floor lounge at Westlaw Main with Westlaw Employee Ruven Schwartz Esq and Datum VP Mitch Stone

7

present. Hastings had accompanied Glassey and Stone to Westlaw to discuss time services and Glassey's Trusted Timing Infrastructure with them as a product potential.

35. Hastings was excited about the idea of using secure time and location information (physical, logical or virtual) as a control aspect of a policy switch. This can be used for many other key applications as well so he became very aggressive with Glassey about getting these 'new features' patent protected and added to Confidential Courier at all costs.

36. One weekend in later August of 1997 Glassey was approached by DDI president Mark Hastings about his (Hastings) acting as Glassey's Patent Agent for the filing of the location based service patent. Glassey initially didnt trust the situation and because Hastings was formally represented by Richards and Fish and they would be representing Glassey before the PTO through Hastings it seemed believable.

37. There were numerous discussions between Glassey and Hastings about this including one key one where it was finally agreed that "with Richards and Fish as counsel of record that Hastings could represent Glassey before the PTO".

38. Under the NDA between Glassey and Hastings, the Plaintiffs turned over the initial Intellectual Properties to the Agent (Hastings and DDI) for the creation of the filing documents for the USPTO;

39. At this Time DDI president Mark Hastings and his counsel from Richards and Fish approached Glassey with a new plan. The "new plan" was that rather than Hastings filing a new patent for Glassey which he would sublicense from Glassey he would file an amendment to the one he already had and Glassey would share the enforcement rights against its IP through a subsidiary agreement;

40.     This was a 100% reversal of the roles under which the original agreement was consummated. Because of this Glassey again was very uncomfortable about and said no initially; it was only after a number of further conversations and Glassey's being assured by Richards and Fish *the patent would issue quickly* Glassey agreed.

41.     Thus the amended instance of the Hastings "Confidential Courier" patent ("'992") was filed in 1998; Everything was fine initially although Glassey and McNeil were concerned about how little of the original ((2 technology one could identify in the filing but it was early in the process and the initial Examination was a year away or so Glassey was told so we just waited.

42.     As part of his work with Datum Glassey had introduced Hastings to Datum formally; In early 1999 things changed.

43.     Hastings immediately stopped answering questions about the patents filing and in July in violation of the Co-Inventor "E Assignability Section Hastings reassigned the patent to Datum and sold them Digital Delivery Inc taking a job replacing the then incumbent president of the BANCOM Division of Datum where Glassey's work was done.

44.     As to how he did that when Richards and Fish filed the patent originally they omitted the agreement which said the assignment was only valid for one year (in the Co-Inventor Agreement) from the filing and improperly filed it as ASSIGNED instead of CONDITIONALLY ASSIGNED. This allowed Hastings to sign on the reassignment without Glassey's or McNeil's Signature. This was corrected in 2013 with the attached exhibit (K- USPTO correction to original filing status). Thus the Federal Record was finally corrected on August 6th 2013 to reflect the original assignment as conditional;

45.     Glassey's sole purpose for retaining DDI was to get a low cost guaranteed filing in half a dozen jurisdictions and to get the patents issued as soon as possible. The new amended instance of the original DDI patent was to be filed with U.S. Office and the foreign instances agreed upon later (Brazil, EU, Japan, Canada, and South African) as the **Controlling Access Patent** and DDI and Plaintiffs sought to formalize an agreement which would allow for the most prompt filing of the application for the Controlling Access Patent. In fact US6370629 was filed for joint access and Plaintiff's use in Japan, Canada, the EU, South Africa and Brazil.

## The 1998 Co-Inventor Agreement

46.     To enable this global patent filing activity effective on or about October 26, 1998, Plaintiffs and DDI entered into an"pre-paid legal services" agreement known as the **Co-Inventor Agreement**, a copy of which is attached hereto as Exhibit C.

47.     The Co-Inventor Agreement retains Hastings as the president of DDI to act as Glassey's Patent Agent with full legal control and power of attorney relative to the limited area of patent filings.

48.     According to Recital D the Co-Inventor Agreement, its purpose was:

> [T]o allow the Controlling Access Patent application to be submitted as early as possible and prior to a definitive agreement between the parties with respect to each party's rights to exploit the Controlling Access Patent, the respective mutual and exclusive rights to the underlying or derivative technology, methodology, or other patentable subject matter contained or referenced in the Controlling Access Patent, and the compensation to be paid by Digital to Glassey-McNeil for assignment of certain rights therein to Digital.

49.     Recital A of the Co-Inventor Agreement commemorated DDI's ownership of the Confidential Courier product and its underlying patent ('992 patent).

50. Paragraph 1.C. of the Co-Inventor Agreement commemorated that Plaintiffs developed and provided to the Controlling Access Patent application geolocation Controls and Location Based Services both "**Phase II**" a Term of Art meaning a system providing both physical location information but also very accurate time with phase matching data for aligning cryuptographic heartbeats across a network or distributed framework. One very powerful source is obviously the US Governments GPS sources. Thus Phase-II provides a new level of authentication over the basic services Hastings had built into his existing patent. From the data model perspective Phase-II technology represents an authentication schema concurrent with industry standards in cryptography[1]

51. Paragraph 2.A. of the Co-Inventor Agreement provided further that, "[DDI] acknowledges that the Phase II technology is solely and exclusively the idea and invention of [Plaintiffs]."

52. The Co-Inventor was intended to be replaced in form by a larger agreement. One which codified Glassey's rights to the IP and his third party enforcement rights (any and all uses) for the IP he purchased the pre-paid legal services for. As evidence of this the Co-Inventor Agreement explicitly contemplated that a future "definitive" agreement would be entered among the parties concerning the compensation to be paid to Plaintiffs as well as the parties' mutual and exclusive rights to the Controlling Access Patent within 365 days of the signing At that time the Provisional Access and use Rights to both the original filing and Hastings 992 patent became open.

---

[1] as an example we list one Phase II authentication schema description - "a cryptographic signing and verification process with the transmittal of time and geographic positioning information that allows a legally indemnifiable degree of trust to be established in the time and geographic positioning information thus conveyed." but there are a number of others as well.

53. Finally the last possibility documented in the Co-Inventor Agreement was a total failing on Hastings part where both patents revert to shared of Glassy as the superior rights holder in third-party enforcement of the patent-protected IP.

54. Two days after the Co-Inventor Agreement was executed, on October 29, 1998, the Controlling Access Patent Application (the "**1998 Patent Application**") was filed with the US Patent and Trademark Office ("USPTO"), a copy of which is attached as Exhibit D hereto and in it McNeil and Hastings partners we added to the patent filing so the final title includes all four parties, Glassey as the principal inventor, McNeil as Glassey's senior Engineering Specialist, and Hastings and Willets for their work in the previous patent. As it happens though Willets was never on the original patent and as such shouldnt have been on the final filing as well. This became yet another misrepresentation from Hastings in the filing of US6370629.

55. In violation of the IP transfer provision of the Co-Inventor Agreement Datum and DDI consummated a merger on or about July 29, 1999, whereby DDI became a wholly owned subsidiary of Datum upon which merger Datum became the successor-in-interest to all of the rights and responsibilities contemplated by the Co-Inventor Agreement. As such Datum became the Fiduciary although Glassey and McNeil were both very dissatisfied with the situation.

## The 1999 Controlling Access Settlement

56. Immediately after the prohibited purchase of Digital Delivery Inc,. Datum Corp fired Bancom Division President David Robinson and replaced him with Hastings.

12

57.     In addition to Hastings coming on board as an officer of Datum two weeks later in August 1999 Datum without warning filed a lawsuit against Glassey and McNeil ("the dispute");

58.     Datum also froze all payments outstanding to Glassey and McNeil after they had just had Glassey expend significant amounts of money developing designd and marketing materials for them. The net effect was they as GMT's sole customer was Datum functionally drove GMT into insolvency because they froze GMT's invoices still outstanding; as such they drove the GMT and both Glassey and McNeil personally to the edge of bankruptcy.

59.     Through this, and with what turned out to be very bad legal advice from GMT counsel Jason Book Esq, both  Glassey and McNeil were forced to accept the settlements that Datum Counsel John Cannon drafted, as such Datum was the sole architect of the forms and their contents in the two settlement documents.

60.     One Settlement for Digital Delivery Inc and a second for the Consulting Work and the IP under it which is the subject of US Patent 6393126 called the TTI Settlement. Both used the same template and were drafted by John Cannon Esq of Stadling Locca in Newport Beach California.

61.     The two separate settlement agreements were simultaneously signed in late November 1999, one of which is at issue in this this section of the lawsuit and is the so-called **Controlling Access Settlement and its twin the DDI Patent Rights Settlement/management agreement**, a copy of which is attached as Exhibit E.

### Controlling Access (DDI Patent Agent services) Settlement

62.     The Controlling Access Settlement  is the specific document the Co-Inventor Agreement says will replace it in regard to its patent filing efforts.

63.     The Controlling Access Settlement was intended as a cap or umbrella for other documents necessary to complete the deal and properly control the patents and the roles for both parties, but served as the "definitive" agreement between Plaintiffs and Datum concerning the initial compensation to be paid to Plaintiffs; it is very clear about who owns which scope of technology but Plaintiffs would have to wait to see what the final patent was issued as. It is contemplated in 1998 by the Co-Inventor Agreement fully.

64.     Paragraph 2.2 of the Controlling Access Settlement defined the "Controlling Access Patent" for purposes of that agreement to include the 1998 Patent Application as well as foreign patents pending Filing Services under the Fiduciary Role for the Patent Filing Agent herein.

65.     Paragraph 2.3 of the Controlling Access Settlement defined **Phase II Technology** as:

> The method of authentication, encryption and transmission of date/time and/or location data for the purpose of linking together two or more disparate electronic components, such that a trust model is established between them. Such physical elements must individually be capable of computational and cryptographic functionality, but computationally may be isolated from one another. Such electronic components must be physically secure, and communicate with each other over communications channel(s) which may themselves be insecure.

66.     Phase II Technology included, and expanded, the technology identified as GPS Phase II technology which had been identified as the property of Plaintiffs in the Co-Inventor Agreement.

67.     Pursuant to Paragraph 3.2 of the Controlling Access Settlement, Plaintiffs assigned all rights, title, and interest in the 1998 Patent Application and foreign patents based thereon to Datum.

68. However, Datum explicitly agreed in Paragraph 3.3 on the Controlling Access Settlement that Plaintiffs, "own[] all rights, title and interest in the Phase II Technology".

69. Paragraph 3.3 of the Controlling Access Settlement granted Datum a, "perpetual, non-exclusive, irrevocable, assignable, sub-licensable, worldwide license for use of the Phase II Technology and derivatives thereof, with rights to sublicense, in connection with the limited scope of the DDI Confidential Courier product and its derivatives".

70. According to the foregoing provisions of the Controlling Access Settlement, Plaintiffs had exclusive rights, title, and interest to Phase II Technology, anywhere in the world, except for the limited rights which Datum had to use that Phase II Technology which was identified in the 1998 Patent Application.

71. Also according to the foregoing provisions of the Controlling Access Settlement which granted all ownership rights in Phase II Technology to Plaintiffs, subject to Datum's license, Datum had an obligation to protect and maintain any and all patents relating to Phase II Technology to which it was assignee.

72. Paragraph 3.6 of the Controlling Access Settlement further clarified the parties' intent that Plaintiffs would continue to have the right to commercialize Phase II Technology.

73. Specifically, Paragraph 3.6 memorialized that Plaintiffs agreed not to, "make, use, or sell any products developed using or derived from the Phase II Technology which also include the technology described in or covered by [Datum's existing Confidential Courier patent]" which under the terms of the original Co-Inventor Agreement was not jointly owned by both DDI and Glassey in the agreement.

74. The above clarifies that Plaintiffs retained all rights to make, use, and sell new "Phase II" Technology which did not also include the technology described in or covered by the patent covering the Confidential Courier product, but since the patent (the 992 Patent had already transited to a shared resource this provision of the settlement was discovered to be moot and uninforceable.

75. As of the effective date of the Controlling Access Settlement, the 1998 Application had been pending at the US Patent and Trademark Office ("PTO") unchanged from its October 28, 1998, filing date.

## The 2001 Controlling Access Patent Application Expansion

76. After the parties executed the Controlling Access Settlement, Datum continued the prosecution of the Controlling Access Patent but ran into disapproval of the original expansion of Hastings existing patent which was never communicated to Glassey.

77. At no time following the execution of the Controlling Access Settlement were Plaintiffs allowed to be involved in the prosecution of the Controlling Access Patent.

78. At no time following the execution of the Controlling Access Settlement did Datum ever attempt to include Plaintiffs in the prosecution of the Controlling Access Patent or advise them of the status of that prosecution.

79. Following a rejection of the developing application for the Controlling Access Patent for anticipation and another for obviousness, Hastings under his role as the Bancom Division President at Datum radically expanded the amount of Phase II Technology in the independent claims it pursued in the Controlling Access Patent

application in its response to office action dated August 20, 2001 (the "**2001 Patent Application Rewrite**"), a copy of which is attached as Exhibit F hereto.

80.     Plaintiffs did not discover the scope and effect of the 2001 Patent Application Rewrite until 2013.

81.     As a result of the 2001 Patent Application Rewrite, each of the independent claims Datum pursued in its application for the Controlling Access Patent included vastly more of Plaintiffs' Phase II Technology than they had ever agreed to license to Datum in the Controlling Access Settlement. This change is detailed in the attached declaration pertaining to unauthorized changes in the Patent.

82.     The consequence of Datum's radical expansion of the amount of Phase II Technology in the 2001 Patent Application Rewrite was twofold: first, it was sufficient to convince the PTO to grant a notice of allowance of the application and paved the way for issuance of the patent; and second, it had the effect of subsuming what remained of Plaintiffs' Phase II Technology into the issued Controlling Access Patent and prevented them from seeking that patent themselves.

83.     The Controlling Access Patent ultimately issued as US Patent No. 6,370,629 (the "'**629 Patent**") on April 9, 2002, a copy of which is attached as Exhibit G hereto.

84.     The '629 Patent will be in effect until October 29, 2018.

85.     The claims in the 2001 Application Rewrite numbered 12, 18, 21, 25, and 29 were issued verbatim as claims 11, 16, 19, 23, and 27 (respectively) in the '629 Patent.

86.     The 629 Patent contained a significant amount of Phase II Technology which Symmetricom had never compensated Plaintiffs for and which Plaintiffs had free reign to license to third parties.

17

87. Datum, and on information and belief later Symmetricom, prosecuted similar patents to the '629 Patent in other jurisdictions around the world.

## Symmetricom's Repudiation Of Plaintiffs' Rights
## To Phase II Technology

88. In the years following the issuance of the '629 Patent, Plaintiffs attempted to license their Phase II Technology, as embodied in the '629 Patent, to various third parties.

89. Datum (hereafter referred to interchangeably with its parent Symmetricom) interfered with Plaintiffs' attempts to do so by refusing to acknowledge the existence or validity of the Controlling Access Settlement until it produced a countersigned copy for the first time in February 2013.

90. On information and belief, Symmetricom further interfered with Plaintiffs' attempts to license their Phase II Technology by refusing to produce a countersigned copy of the Controlling Access Settlement to Plaintiffs, including refusing to do so in connection with the civil suits relating to the Controlling Access Settlement pending in California Superior Court since 2009.

91. On information and belief, Symmetricom allowed foreign patents which covered Plaintiffs' Phase II Technology to lapse or become abandoned, despite having the duty to maintain those patents and having knowledge that Plaintiffs relied on them to do so.

## COUNT ONE
### (Breach of Controlling Access Settlement by
### 2001 Patent Application Rewrite)

92. Plaintiffs restate the above as if set out in full herein.

93.     In 1999, Plaintiffs and Symmetricom entered into the Controlling Access Settlement by which they contracted for Symmetricom's license to the portion of Plaintiffs' Phase II Technology which was embodied in the 1998 Patent Application.

94.     The Controlling Access Settlement is still in force and serves as the basis for Symmetricom's continuing claim to be the assignee of the '629 Patent.

95.     In 2001 Symmetricom breached the Controlling Access Settlement, and its license to Phase II Technology embodied therein, with its 2001 Application Rewrite to the USPTO, which resulted in the '629 Patent containing claims which read on Phase II Technology never contemplated by the parties to the Controlling Access Settlement and never licensed to Symmetricom.

96.     As a result of Symmetricom's breach of the Controlling Access Settlement, Plaintiffs have been damaged in the amount of licenses they could have received from the Phase II Technology described in the 2001 Application Rewrite, their expectancy therefrom, and/or their lost profits from the 2002 issue date of the '629 through the life of the '629 Patent which will not expire until 2018.

**COUNT TWO**
**(Breach of Controlling Access Settlement For**
**Failure to Protect Phase II IP)**

97.     Plaintiffs restate the above as if set out fully herein.

98.     The Controlling Access Settlement contemplated that certain portions of Plaintiffs' Phase II Technology would fall within the claims of Controlling Access Patent and that Symmetricom would serve as assignee of that patent.

99.     The Controlling Access Settlement also commemorated the fact that Plaintiffs were the sole owners of all Phase II Technology.

100.   As assignee to that Phase II Technology which fell within the Controlling Access Patent, Symmetricom had a duty to protect and maintain all such Phase II Technology, including, without limitation, maintaining all domestic and foreign patent rights thereto.

101.   Symmetricom has breached its duty to maintain the Phase II intellectual property by allowing certain foreign patents covering Plaintiffs' Phase II Technology to lapse.

102.   As a result of Symmetricom's breach of its duty to maintain the patents covering the Phase II Technology, Plaintiffs have been damaged in an amount to be determined at trial.

**COUNT THREE**
**(Unjust Enrichment)**

103.   Plaintiffs restate the above as if set out fully herein.

104.   In 1999, Plaintiffs and Symmetricom entered into the Controlling Access Settlement by which they contracted for Symmetricom's license to the portion of Plaintiffs' Phase II Technology which was embodied in the 1998 Patent Application.

105.   In 2001 Symmetricom submitted the 2001 Application Rewrite to the USPTO, which resulted in the '629 Patent issuing containing claims which read on Phase II Technology never contemplated by the parties to the Controlling Access Settlement and never licensed to Symmetricom by Plaintiffs.

106.   As a result of Symmetricom's unilateral and unlawful expansion of the scope of the Controlling Access Patent, and its status as assignee of that patent, Symmetricom has been unjustly enriched in the amount that it has benefitted in any way from the Phase II Technology not included in the 1998 Patent Application.

## COUNT FOUR
## (Tortious Interference With Prospective Economic Advantage)

107.     Plaintiffs restate the above as if set out fully herein.

108.     Plaintiffs are the sole owners of Phase II Technology with the limited exceptions of Symmetricom's license rights as delineated in the Controlling Access Settlement.

109.     Symmetricom, as the counterparty to the Controlling Access Settlement, had actual knowledge of Plaintiffs' rights to all Phase II Technology, subject to its limited license rights.

110.     After issuance of the '629 Patent, Plaintiffs attempted to license rights to their Phase II Technology with prospective licensees.

111.     On information and belief, Symmetricom directly interfered with Plaintiffs' attempts to obtain economic advantage from their Phase II Technology by advising prospective licensees that Plaintiffs had no rights to any of the property embodied in the '629 Patent, including all Phase II Technology therein.

112.     Symmetricom likewise repudiated the existence of the Controlling Access Settlement to Plaintiffs and to third parties by, among other things, refusing to produce a fully-executed copy of that agreement until February of 2013.

113.     Symmetricom's direct and indirect actions were wrongful and done with the intent to deprive Plaintiffs of their business expectancy with prospective licensees.

114.     As a result of Symmetricom's tortious interference with their prospective license arrangements, Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT FIVE

## (Declaratory Judgment – '629 Patent Contains Phase II Technology Not Within 1998 Patent Application)

115.    Plaintiffs restate the above as if set out fully herein.

116.    There is an actual controversy as to whether and to what extent the 2001 Application Rewrite and the '629 Patent contain Phase II Technology which was not contemplated by, or incorporated into, the 1998 Patent Application or the Controlling Access Settlement.

117.    Plaintiffs request the Court enter a declaratory judgment based upon its construction of the claims of the 2001 Application Rewrite and the '629 Patent and its comparison of them with those in the 1998 Patent Application to delineate with specificity the components of the claims of the 2001 Application Rewrite and the '629 Patent which read on Phase II Technology and are not contained in the 1998 Patent Application.

## COUNT SIX
## (Tortious Interference With Prospective Economic Advantage)

118.    Plaintiffs restate the above as if set out fully herein.

119.    Plaintiffs are the sole owners of Phase II Technology with the limited exceptions of Symmetricom's license rights as delineated in the Controlling Access Settlement.

120.    Defendants have a formal responsibility to protect the IP described in the Settlements it controls for all parties. That specifically includes making sure the patents are viable and unauthorized users are not using the IP or authorizing Copyrightable Standards or Code implementing these standardized functions which will infringe on Plaintiffs rights.

22

121.    As such Count Six involves a DOE,. the Internet Engineering Task Force ("IETF") and its Parent Organization the Internet Society. Symmetricom's direct and indirect actions in its working with the IETF are a key part of their tortuous interference.

122.    In its interfering with Plaintiffs rights, Symmetricom refused to confirm the US 6370629 controlled third-party enforcement rights Plaintiff's enjoyed per the settlement and in doing so (actively participating in the standards process) they defrauded Plaintiff's by placing an IETF controlled copyright onto Glassey's (Plaintiffs) Property as part of the standards practice; this was done by Symmetricom's allowing the IETF, the Global Standards Org to public Glassey IP under their own Copyright and assign formal copyright to it for any and all uses to the world.

123.    In doing this the IETF has used the IP in numerous of its standards despite continuous objection from Glassey over its unauthorized use and the fact the Standards Org as a Consensus based standards organization isnt doing research and cannot claim its doing anything other than IP development for commercial users, and as such has no research exemption.

124.    Further the IETF cannot even if they are a research institution which is highly doubtful since they maintain the Internet Research Task Force, a separate org controlled under a separate set of rules and practices for all research.

125.    As such the IETF publication of our Patented Technologies constitutes a Copyright Infringement on the natural copyright issued when the US Government issued the US patent controlling this material. The principal claim is the IETF not being a research institute or academic practice, under Patent and US IP and Trade Secret Law, no extension of the research exemption under the copyright provision exists, but relative

23

to Global Network Technology Standards, that no copyright based authorization from the Standard Text can allow another party to infringe for any purposes in producing a system which is patent protected, a process which functionally sets aside all of a patent protections on a given technology or system.

126. The IETF didnt react well to be told formally through their Intellectual Property Rights website Plaintiffs owned this IP and that it was not being granted to them under their licensing models. They reacted badly and ejected Glassey on a pretense and made the IP as virtually ubiquitous as any could be today, and in doing so they have deprived the Plaintiffs of both Patent Controlled and Copyright Controls to their own Intellectual Properties while creating billions of infringers today.

## COUNT SEVEN
### (Declaratory Judgment – Patent Fraud, Unauthorized Filing of US6393126)

127. Plaintiffs restate the above as if set out fully herein.

128. Plaintiffs are the sole owners of Trusted Timing System Technology with the limited provisions of the three components licensed for US use only in the Settlement Agreement. Datum filed a patent against the entire Trusted Timing Infrastructure IP library listing Erik Van Der Kaay (US6393126) as the inventor with several of his engineers including those involved in the standards agency frauds alleged in COUNT SIX previously.

129. The Patent was issued in the US and in a number of other countries which are similar to those which the US6370629 patent was filed in.

130. Nothing in the Trusted Timing Infrastructure settlement contemplated Datum filing a patent listing itself as the creator of the technology, something blatantly

false based on the settlement agreement alone. This is fully supported by the Toby Gellman appellate ruling.

131. The amount of the TTI which the patent was issued against like the 2001 changes to '629 included large amounts of Glassey owned IP from the CertifiedTime Inc Bankruptcy (01-54207-MM - San Jose). Additionally aspects and IP controlled by 629 was added to the 3126 patent without authorization to get it issued as well.

132. We therefore seek an order to the USPTO to remove Erik Van Der Kaay's name from this patent as well as the others and to replace them with Plaintiff Glassey exclusively. Likewise there is no assignment of this patent to Datum corporation planned for or authorized in the settlement so we ask the Court to order the Patent Office to reassign this patent with full rights therein to Plaintiff Glassey;

## COUNT EIGHT
### (Declaratory Judgment –International transfer of TTI Intellectual Properties to set aside the Settlement Agreement, Unauthorized removal of TTI from US Courts Jurisdiction)

133. Plaintiffs restate the above as if set out fully herein.

134. Plaintiffs are the sole owners of Trusted Timing System Technology with the limited provisions of the three components licensed for US use only in the Settlement Agreement.

135. Settlement Terms are permanent per section 3.15 and 8.4 of the DDI Settlement contract and require continuous reporting on licensing, and further per sections 8.1 that "any and all disputes for any and all users of the IP sublicensed in the settlement do so in the courts and under the laws of the State of California" and that per

section 8.3 these terms are binding on all successors in any form (including but not limited to end-users of the product and any intermediary distribution framework set up to support them).

136.    Datum corp at some point entered into a Joint Venture with a Cambridge England company called nCipher based on an introduction Plaintiff Glassey had made several years previous.

137.    Datum transferred the protected IP of the TTI settlement to nCipher who took it to England and then brought the product back into the US as an English Copyright and Patent based Product under their name. This violated the terms of the settlement agreement.

## COUNT NINE
### (Declaratory Judgment –Mandatory Acceptance Requirements for transfer of US6370629 to Microsemi)

138.    Plaintiffs restate the above as if set out fully herein.

139.    Per section 8.4 each party assuming a control role for the licensing must notify the Plaintiffs of this within the 14 day period agreed to between Datum Attorney John Cannon and Plaintiffs as documented in the Cannon South African Patent Instance filing release letter.

140.    Plaintiffs request the court issue a declaratory judgment that Microsemi breached this key term and strip Microsemi of the US6370629 patent awarding it in full to Plaintiffs and damages therein as the court sees fit including fraud losses therein.


WHEREFORE, Plaintiffs Michael E. McNeil and Todd S. Glassey request this Court to enter judgment in their favor on all counts, to award them damages in an

amount to be determined at trial, to award them declaratory relief to the effect that the 2001 Application Rewrite and the '629 Patent contain Phase II Technology which was not identified in the 1998 Patent Application, to award them relief in regard to their US3693126 damage claims, and issue formal notice to the IETF and Internet Society "that all of their standards must come into immediate conformance with US DMCA provisions and best practices of a Global Standards Org with regard to its IP Management Practices" meaning there must be a take down policy implemented in all existing IETF standard by order of the court "no matter what contractual agreement exists between the authors and the IETF as to that IP's licensing", and to award Plaintiffs any other relief to which they are entitled, including but not limited to legal fees herein.

Respectfully submitted,

_____

**Todd S. Glassey, In Pro Se**

tglassey@earthlink.net

305 McGaffigan Mill Road
Boulder Creek CA 95006
Telephone: (408) 890-7321

## **Jury Demand**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of all issues so triable.

_____ 8/7/2014

Counsel for Plaintiffs

Michael McNeil 8/7/2014

## **Declaration pertaining to Modification of the Patent**

141.    The 2001 Patent Application Rewrite modified Claim 1 to insert Phase II

Technology as indicated below in bold and italics:

> A method for controlling access to stored information comprising:
>
> Determining an actual geographic position where said stored information is located based on signals received at a receiver supplying reliable position information;
>
> ***Cryptographically signing said actual geographic position with a receiver encryption key;***
>
> ***Verifying the signature of said actual geographic position;***
>
> Determining that said actual geographic position is within a geographic region within which access to said stored information is authorized; and
>
> Permitting access to said stored information.

142.    The 2001 Patent Application Rewrite modified Claim 12 to insert Phase II

Technology as indicated below in bold and italics:

> Apparatus for controlling access to stored information comprising:
>
> A receiver supplying reliable position information for determining an actual geographic position where said stored information is located, ***wherein the receiver comprises a receiver encryption mechanism providing a receiver encryption key for cryptographically signing data comprising the actual geographic position***; and
>
> A computer for comparing said actual geographic position with a geographic region within which access to said stored information is authorized,
>
> Wherein said computer permits access to said stored information if said actual geographic position is located within said authorized geographic region.

143.    The 2001 Patent Application Rewrite modified Claim 18 to insert Phase II

Technology as indicated below in bold and italics:

> A method for controlling access to a subset of files belonging to a larger set of files of stored information comprising:
>
> Associating a unique file encryption key with each file from the larger set of files and encrypting the files using the associated encryption keys;
>
> Associating each of the files from the larger set of files with at least one authorized geographic region within which access to said stored information is authorized;
>
> Determining an actual geographic position where said stored information is located based on signals received at a receiver supplying reliable position information;
>
> ***Cryptographically signing at least the actual geographic position at the receiver;***
>
> ***Verifying the signature of the actual geographic position;***
>
> Comparing said actual geographic position with said authorized geographic region; and
>
>  Providing a file decryption key which authorizes access toad n permits decryption of said files belonging to said subset of files, provided that the actual geographic position is located within the authorized geographic region for the files belonging to said subset of files.

144.    The 2001 Patent Application Rewrite modified Claim 21 to insert Phase II

Technology as indicated below in bold and italics:

> A method for controlling access to stored information comprising:
>
> Determining an actual date or time at the location of said stored information based on signals received at a receiver supplying reliable time information;
>
> ***Cryptographically signing at least the actual date or time at the receiver;***

*Verifying the signature of the actual date or time;*

Comparing said actual date or time with a predetermined date or time interval at which access to said stored information is authorized; and

Permitting access to said stored information if said actual date or time occurs within said authorized date or time interval.

145.   The 2001 Patent Application Rewrite modified Claim 25 to insert Phase II Technology as indicated below in bold and italics:

A method for controlling access to stored information comprising:

Forming a policy associating said information with authorized geographic regions and authorized time intervals;

Cryptographically signing said policy and said information;

Storing said signed policy together with said signed information;

Providing a password for unlocking said policy;

Determining an actual geographic position where said stored information is located based on signals received at a receiver supplying reliable position information;

Determining an actual time;

*Cryptographically signing at least the actual geographic position and the actual time at the receiver;*

*Verifying the signature of the actual geographic position and the actual time;*

Comparing said actual geographic position and said actual time with said authorized geographic regions and authorized time interval of said policy; and

Permitting access to said stored information if said actual geographic position and actual time falls within said authorized geographic regions and authorized time interval of said policy.

146.   The 2001 Patent Application Rewrite included a new independent Claim 29 which was entirely comprised of Phase II Technology:

A method for controlling access to stored information, the method comprising:

(a)     Determining a position;

(b)     Cryptographically signing data comprising at least a representation of the position;

(c)     Verifying the signature of the data comprising at least a representation of the position;

(d)     Determining that access to the stored information is authorized at the position;

(e)     Permitting access to the information based at least upon (c) and (d).

// Todd S. Glassey - 8/6/2014