RECEIVED
FILED
AUG 25 2014
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

(San Francisco Division)

TODD S. GLASSEY, In Pro Se
305 McGaffigan Mill Road
Boulder Creek, California 95006

And

MICHAEL E. MCNEIL, In Pro Se
PO Box 640
Felton CA 95018-0640

Plaintiff,

vs.

MicroSemi Inc; The IETF and ISOC, and the US Government and Industry partners (including but not limited to Apple, Cisco, eBay/Paypal, Google, Juniper Networks, Microsoft, NetFlix, and Oracle), USPTO ALJ Peter Chen Esq, and two individuals (Mark Hastings and Erik Van Der Kaay) as "NAMED DOES"

Defendants.

CASE NO. CV-14-3629-EDL

JUDGE E. D. LaPorte, Courtroom E, 15th Floor USDC San Francisco

**COMPLAINT**
Sherman Act violation, Fourth, Fifth, Seventh and Fourteenth Amendment Violations; Foreign Antitrust Act violation; RICO Act claims against Microsemi and IETF; Copyright Fraud (IETF); Patent Infringement (IETF et Al.); Tortuous Interference; Assorted Patent (Fiduciary) Frauds;

Illegal use of FISA Act provisions in those violations by Defendant USG

**Jury Demand Endorsed Hereon**

For this Complaint, Plaintiff Todd S. Glassey and Michael E McNeil state as follows:

## Defendants, Does, Patents, and Settlement List

1. Plaintiffs are individuals who were, for all times relevant hereto, residents of Santa Cruz County, California.

2. Defendant Microsemi, Inc. ("**Microsemi**"), is, on information and belief, a Delaware corporation with its principal place of business in Aliso Viejo California. This under Bivens includes the "unknown Officers and those controlling the operations of the Defendant Microsemi" as individuals under the Bivens precedent[1].

3. Defendant Symmetricom, Inc. ("**Symmetricom**"), was, on information and belief, a Delaware corporation with its principal place of business in Irvine California.

4. Defendant Symmetricom did, on information and belief, acquire the assets and liabilities of Datum, Inc. ("**Datum**"), in 2002 through a Merger creating a new Symmetricom Corroboration as the successor to Datum.

5. Defendant Erik Van Der Kaay ("**EVDK**") is by information and belief the CEO and Chairman of the Board of the Datum Corp (the umbrella Corp holding the Business units of Datum and its acquired companies);

6. Defendant Datum did, on information and belief, acquire the assets and liabilities of Digital Delivery, Inc. in or about July 1999.

7. Defendant Digital Delivery Inc ("**DDI**") is a Massachusetts based corporation which Plaintiffs retained for Patent Agency legal representation;

8. Defendant Mark Hastings ("**Hastings**") is by information and belief the President and Founder of DDI and later was made the President of the BanCom (Bandwidth Compression) division of Datum Inc;

9. Both Defendants, Hastings and Van Der Kaay are direct signatories to Glassey and McNeil contract documents with both corporations and both names

[1] (***Bivens v. Six Unknown Named Agents***, 403 U.S. 388 (1971))

appearing on the DDI settlement and Van Der Kaay's on the TTI Settlement as well herein;

10. Defendant Microsemi ("**Microsemi**") is, on information and belief, the successor in interest for any liabilities of Symmetricom, Datum and DDI to Plaintiffs. As such any use of the predecessor name for Microsemi is only intended to indicate the time frame for the action or claim in this ongoing fraud and Sherman Act Violation.

11. The Defendant Internet Engineering Task Force ("**IETF**") is on information and belief, a Industry-Wide Technology Standards Collective and is operated under the banner and law of the US as a subdivision of the Washington DC Corporation called "The Internet Society".

12. The Internet Society (**"ISOC**") operates the IETF is as the world's Global Standards Organization for the Internet and it is the IETF who has produced the majority of the network standards that applications which infringe on the rights here were written from.

a. This definition of the IETF includes their management under Bivens and membership in the entire IETF as a whole and in several particular groups including but not limited to the **IETF Intellectual Property Rights Working Group** (IPR), **IETF GeoSpatial Controls Working Group (GeoPriv)**, the **IETF or Generic Network Working Group (IETF@IETF.ORG)** where everyone talks about everything and time-related ones in both **PKIX WG** (the PKI working group areas) and those pertaining to other protocols like **Secure DNS** (**DNSSEC**) which uses the Infringing IP extensively as just one of many examples of IETF infringements;

13. The Defendant Internet Society ("**ISOC**" - www.isoc.org) itself includes such other child-organizations as the Internet Corporation for Assigned Names and Numbers ("**ICANN**") and the American Registry for Internet Numbers ("**ARIN**") and its foreign instances.

14. Because of the ISOC and IETF dependence on Computers running "Infringing Networking Drivers and Applications" ("**INDA**") the ISOC as well as the IETF, the ARIN, the ICANN, and all other operating infrastructure itself are named collectively as ***members of the ISOC Family herein***;

15. And that this matter pertains as such to the ISOC all of its many arms and their publications as well as all electronic events performed online by them since the Cease and Desist Order was served on ISOC and its IETF operating unit through their IETF IPR Filing Process in 2004 (their method of service); As such that the IETF and ISOC are named actual defendants to the matter herein;

**The following Parties are NAMED AS DOES in accordance with provisions of the BIVENS[2] ruling**

16. The Defendant "United States Government" ("**USG**") from Legislative to Administrative branches, because of its dependence on Computers running "INDA" is named as a Defendant DOE and since the full scope of the names therein are unknown to the Plaintiffs at this time this naming convention meets the strict DOES limitations for the US District Court';

[2] ***Bivens v. Six Unknown Named Agents***, 403 U.S. 388 (1971),

17. Further the following Federal Agencies and Roles are known but the parties filling those roles are unknown at this time and so they are also identified directly as DOES in this matter;

a. The US Department of Commerce ("**DoC**") and its three key subdivisions (**US PTO** - Patent and Trademark Office, **US NTIA** - National Telecommunications Infrastructure Administration, and **US-NIST** - The US National Institute of Standards and Technology **and in particular its Information Technology Laboratory** (**NIST-ITL**)) are entities of the United States Government;

b. **Defendant Peter Chen Esq**, under Bivens is named as an actual defendant and not a DOE although he now is employed by USPTO, and so is named both under their naming as a DOE and as a real person; Additionally we name Defendant Peter Chen's Lawfirm at the time of the alleged acts herein of Lathem Watkins LLP as a DOE based on Bivens standing for the parties within the firm actually involved (a matter which Discovery will properly disclose);

c. The **US Department of Energy** as a consumer in operating the US Smart Grid and various other research projects which make it an infringer;

d. The **US Department of Transportation** and the **US FAA** Flight Tracking and Messaging Systems using infringing technologies nationally herein;

e. The **US Treasury** as a consumer of the infringed properties and the oversight provider for its agencies the **SEC** as well as the **IRS**;

f. The **US Department of Defense** ("**DoD**");

i. Any and all parties (**Boeing, Macdonald/Douglas, Lockheed Corp, General Atomics, et Al)** building or selling Drones or components thereof to the US Government;

ii. Any and all parties building selling or transporting **Ballistic Sensor Fused or Controlled Munitions or Munitions Delivery Systems** including but not limited to those ballistic devices used to place objects into low and medium orbital tracks;

g. The **US Intelligence Community** (all agencies and those attached therein).

h. **The Office of the President of the United States of America** ("**POTUS**") and **the operations of the Whitehouse Webserver itself**;

i. The **Honorable Mr. Jerry Brown, the Governor of the State of California and the State of California itself under** 42 U.S.C. § 1983 and its provisions for Civil Litigation against a State under the ***Enforcement Act of 1871*** and other statutes;

**Industry Members of the IETF and ISOC**

18. The following are named members of the IETF who all either both use and operate within the IETF itself a formal presence and who both use these controlled Intellectual Properties controlled under the "TTI and DDI Settlement Documents" inside their products and corporate operations both; They include but are not limited to

a. **Apple Corp**, A Delaware Corporation including all of its external and foreign corporations or assets;

b. **Cisco Corp**, A Delaware Corporation including all of its external and foreign corporations or assets;

c. **eBay and Paypal**, each a Delaware Corporation including all of its external and foreign corporations or assets;

d. **Google,** A Delaware Corporation including all of its external and foreign corporations or assets; and all of its sub-division and free-standing corporations operated outside of the Google brand;

e. **Juniper Networks**; A Delaware Corporation including all of its external and foreign corporations or assets;

f. **Microsoft Corporation** a Delaware Corporation and all of its free-standing business units and external corporate assets;

g. **and Oracle Corp**, A Delaware Corporation including all of its external and foreign corporations or assets;

h. Additionally there is one other DOE to name as a corporation; That being The **Thales Group ("Thales")** (a Delaware Corporation) the landed US Base of the larger Defense Systems contactor "The Thales Group" of Cedex France, and its **eSecurity Division**, A Delaware Corporation called "**E-Security, Inc**" (nee "nCipher Inc" of Cambridge England).

i. The eSecurity Division of the Thales Group US operations is located in the State of Florida; and claims against Thales Group and in particular

to the eSecurity Division pertain to its use of TTI Settlement IP and breach of the TTI Settlement through its partner Microsemi;

**PATENTS**

19. US6370629 ("'**629**") the US patent filed in Plaintiffs behalf by Mark Hastings of DDI, **EP-0-997-808A3**, the Abandoned instance of the US6370629 filed in the EU, **BR9904979** the abandoned instance of '629 filed on Plaintiff's behalf in the Nation of Brazil; **CA2287596** is the abandoned filing of US6370629 in the Nation of Canada, as **2000163379** is the number of the '629 filing in Japan, and finally the South African filing **ZA1999/06799**

20. US6393126 (aka "**3126**" also known as US 20020056042 A1) "a System and methods for generating trusted and authenticatable time stamps for electronic documents" ("'3126"), the US patent filed by EVDK showing himself as inventor of IP "he licensed limited derivative uses of from Master Designs for the TTI" belonging to Plaintiff Glassey; Likewise **CA2398415** (CAi2398415 A1) is the unauthorized filing of US6393126 in the Nation of Canada, it exists in the EU (**EP 1279287** A1) and was expanded by re-filing as the **US 20020056042 A1 WO** patent application which did issue;

**SETTLEMENT AGREEMENTS**

21. **DDI Settlement** - pertains to the Pre-paid legal service agreement with DDI (the Co-Inventor Agreement) and Datum's limited use of the patents' protected IP while its continuing role as Fiduciary persists. The Settlement

Agreement is the other half of the Co-Inventor Agreement Document Pair that is described in detail in the Co-Inventor Agreement.

22. **TTI Settlement** ("TTI") - pertains to the Datum use of the Glassey TrustedTiming Infrastructure and its limited use of the IP in the United States and State of California legal requirements therein.

23. **Co-Inventor Agreement** - The PrePaid Legal Service Agreement and Patent Assignment Documents (self explanatory) - the original Co-Inventor Agreement to was used to create a patent filing, which became the shared use patent US63709629 with DDI and its successors as the permanent fiduciaries in charge and responsible for the costs in those actions.

**JURISDICTION AND VENUE**

19. This Court has original subject matter jurisdiction over this suit pursuant because of a number of issues the first of which is that this matter pertains to 28 USC § 1338 because the matters in it relate to patents, International filing of patents and copyright infringements; It also relates to Sherman Act and rulings from the US Supreme Court (MGM Studios v Grokster) and other key rulings which State Courts do not have the authority to apply in this matter.

20. This subject matter pertains to the use of the US Foreign Intelligence Service Act to create a set of "Impossible hurdles" for Plaintiffs to cross to bring this into Federal Court which would stop anyone retaining private counsel through the service of a FISA Act Warrant or National Security Letter in the matter herein;

21. This Court has subject matter jurisdiction over the remaining claims at issue in this suit pursuant to is supplemental jurisdiction as codified by 28 USC § 1367 because they form part of the same case and controversy as those claims relating to patents and their infringement through licensing issued via copyright in Global Network Standards for the use of these intellectual properties.

22. This Court has personal jurisdiction over this matter because the Plaintiffs reside in this judicial district and a substantial portion of the events below took place in this district.

23. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to the claims at issue in this dispute occurred in this district.

24. Additionally under the construct of ***Subject Matter Jurisdiction***, because this case uniquely involves both US and a number of both legally and illegally filed International Patents it is both a Sherman Act and the Foreign Antitrust Act with their provisions which now control large parts of the US National Critical Infrastructure this case can only be heard before the US District Court since no State Court has authority to issue Orders against the US Government for patent and international antitrust matters.

25. Finally under Jurisdiction, this matter asks the US District Court a unique and novel question of Federal Law "as to whether Patent Protections in an issued Patent can be set aside by a copyrighted Network Technology Standard under the Defendant IETF's claim that 'Copyright Section 107 Exemptions also allows them to infringe on patent protections on software products they designed the very uses for themselves'".

26. The assertion of this litigation is that this is a statement which on its face directly violates the US Supreme Court ruling in MGM Studios v Grockster while they (the IETF) continue to publish under their own copyright against their use of the technology, a license we allege is "intended to cloud or make impossible to enforce ***any Software patent protections globally*** against those IP's used without authorization in those standards" and on which they the IETF have since made the world's computers dependent.

27. This question is amplified by the commentary that the IETF in fact uses this same Intellectual Property in the form of programs inside its infrastructure without authorization daily to operate the IETF's computers, and that this was done after codifying it into the global standards for all Local Area Networking today.

**28.** The question posited on the court by this suit is now that this was formally done to the Plaintiffs IP's and re-licensing enforcement rights by Defendants Microsemi and IETF and their third-party infringers, the question therein before this court is "what are Plaintiffs' recourse herein?".

**STATEMENT OF OPERATIVE FACTS**

29. This Complaint is being brought in the United States District Court because there are multiple issues in dispute between multiple parties including the US Government and a Global Standards Organization which require the Court to construe the claims of certain US Patents and a set of alleged frauds therein at the Fiduciary level, the relationship of those Patents to US Copyrights when a Global Standards Agency takes that IP and weaves it into the process descriptions of their networking protocols.

30. And finally the effect under MGM Studios v Grokster and other precedents pertaining to Intellectual Property protections what the recourse is against the Standards Agency and their Membership for these actions which force anyone implementing programs that meet that standard to infringe.

31. And additionally for their (the Standards Agency and its parent the ISOC) use of those infringing programs in their own operations.

32. The allegation of the claims is that because the IETF further encoded those protected methods from a US or Foreign Patent into their Standard, this makes anyone using that standard equally culpable for their actions as third-parties to the alleged conversion of private property this suit alleges.

**<u>The Complaint</u>**

33. This complaint is based on the complaint, supporting evidence exhibits, declarations and memorandums of points and authorities, precedent law, US national IP Policy, *and is fully supported by the US Government mandatory requirements per the TRIPS/PCT treaty agreements.*

34. Additionally aspects of this matter pertain to "a set of alleged frauds which the primary defendant Microsemi committed with in concert with the Global Standards Organization IETF (the Internet Society) to prevent Glassey and McNeil's enforcement demands previously that the IETF and everything it produced since 2004 is based on an active infringement in its operations" and they cease and desist any use of the IP. As such a subsidiary claim against all of the online networking standards produced is included as well.

**Defendant IETF and their use**

35. The Defendant IETF (The Internet Engineering Task Force) is a global standards organization who operates their infrastructure across the Internet as part of their charter so they use all of the standards they create in the form of programs and infrastructure inside their frameworks. The IETF is an operating unit of the Internet Society and they bear full financial responsibility for its operations and these alleged frauds herein we assert.

36. The IETF has no authorization to use the IP for its own uses and because of that it "likewise cannot publish across its framework anything which infringes because it cannot use that IP inside its own framework".

37. This then is the Catch-22 the IETF has created. They can no-longer operate without infringing the Phase-II Technology Licensing Rights the Plaintiffs are the sole owners of because it is inside the machines they created the standards for.

38. To summarize the claims against IETF and ISOC: The unauthorized use of the Patent-Protected Intellectual Properties is then alleged in both 1) the IETF operating infrastructure and then 2) as direct additions to their documents themselves as the "methods and processes of the protocols they are standardizing"; We further state that this has already been done for a number of the World's Internet Standards such that it created three billion daily infringers; the net-effect is this single Patent now controls (or there are claims for) most all online commerce globally and the loss amounts respective of that include but are not limited to the direct infringements "for any and all Local area and Internet Application Systems" in use globally today.

39. The functional result is that everyone using the Local Area Networking Protocols outside the Internet is also an infringer of those same IP rights;

40. That because of the alleged fraud inside the very standards process itself, an action which could have been stopped by defendant Microsemi as far back as 2004 when the first "Acknowledgement of Glassey and McNeil rights requests were submitted to then 'Symmetricom Corp' as the predecessor to Microsemi", both the IETF (and its membership) and Microsemi equally bear responsibility under the precedents set in MGM Studios v Grokster and others, and are liable herein for any and all damages resulting from their collective and individual actions.

**Microsemi blocked verification of all of Plaintiffs verification requests**

41. Rather than perform its role under the contract Symmetricom Staff refused to confirm or even respond to the parties we requested they confirm the settlement and our rights to.

**2013/2014 Breaches**

42. Finally that to Transfer the Settlement Agreement and the Role of Fiduciary codified in it that (see CONTRACTS/DDI-Settlement) Microsemi must formally and publicly assert its liability or no such transfer occurs. Microsemi has refused all communication and demands it agree to the terms of the Contract as the Settlement Agreement requires and that has created a new cause of action in this matter in 2014 which tolls the statutes on all other acts in this matter as well.

43. As such it is in breach of the Settlement Agreement as well currently supporting these claims.

**HISTORY: Previous Litigation**

44. Prior to the filing of this Complaint in this Court, the Plaintiffs and Symmetricom were parties to a California Superior Court suit captioned *Michael E. McNeil, et al. v Book (Symmetricom) et al.*, which was dismissed without prejudice to any of the claims therein and proceeded as that Court's Case No. CV 165643 (the "State Court Lawsuit").

45. This filing is the transfer of that lawsuit to the Federal Jurisdiction in full because the State Court Lawsuit could not continue to be prosecuted in California Superior Court because, as that case developed, it became apparent that the California itself as the State was conflicted as a major infringer and further the Superior Court would be required to construe "US Patent and simultaneous copyright claims" which no Federal Court has ruled in yet, and perform this ruling against parties in a number of jurisdictions (*the IETF and its international members) to render any judgment on the claims for relief Plaintiffs brought, and that the California State Court lacked the subject matter jurisdiction to do so.

46. Further since the Federal Government is the signatory to the TRIPS agreement the international nature of the abandoned instances of US6370629 patents filed in Japan, Brazil, Canada, South Africa and the EU are only actionable under the TRIPS treaty in the US and only the US District Court has standing in an international treaty.

**HISTORY: Plaintiffs' Relationship with Datum**

47. In or about October 1997, Plaintiff Glassey approached Datum through Davey Briggs VP of Marketing for the Beverley Massachusetts division of Datum. The purpose of the conversation was to retain Datum to "manufacture a component of the time controls" for an email and document control gateway of Glassey's design. The design was called the Trusted Timing Infrastructure and creates a set of evidence-to-transaction models and the technology to implement them.

48. Initially Datum said "no to building the high-end components of the system" but was very interested in the component level Trusted Local Clock Module as a potential mass-market addition to Datum's existing Board Level Timing Products so they referred GLASSEY to the San Jose California division called BANCOM.

49. At Bancom/Datum Glassey interfaced initially with Mitch Stone ("**STONE**") the VP of Marketing; Glassey's request to Datum if he was right would open new end-user and OEM markets to Datum in the board level timing products area and to further to that Stone opened detailed market analysis discussion between Plaintiff Glassey and Datum, concerning whether Datum and Glassey might undertake broader business efforts together; To allow free and open discussion about Glassey's IP Datum and Glassey entered into a mutual nondisclosure agreement in November 1997 (the "**Datum NDA**"). Mitch Stone processed that NDA.

50. In the months following the execution of the Datum NDA, Glassey and Datum (through Mitch Stone as the principal point of contact) had a variety of conversations and did a variety of industry analysis efforts to determine the total potential of the market sector for this time-stamping evidence system; this effort

included two road trips on which Glassey and Datum VP of Marketing Mitch Stone ran the customer survey with exciting results.

51. The next step was a meeting "with the division presidents of all of Datum and a Board Meeting" which was to happen at a local trade show in Atlanta; to Attend the meeting Glassey was flown out to present the total of the potential to the Board and officers of the corporation for the Trusted Timing Infrastructure components he asked them to build for him. The meeting produced full approval for the joint-development effort.

52. At this point Datum initiated aggressive discussions with Glassey about product design of their systems and how his infrastructure could be used to advance their existing BC635 GPS based timing card as a stand alone and clustered time service module.

53. This excited Datum CEO Erik Van Der Kaay (EVDK); EVDK called Glassey and told him the deal was on. He asked Glassey to both incorporate and bring in at least one more engineering member for his team and promised both guaranteed financing through a monthly payment process to let GMT just focus on the engineering as well as longer term reseller status.

54. To meet that demand, in early 1998 Plaintiff Glassey was joined in his commercial efforts by Plaintiff McNeil in Glassey's new company known as Glassey-McNeil Technologies or "**GMT**".

55. To support Datum running Payroll for GMT on or about May 4, 1998, Plaintiffs each executed a consulting agreement with Datum for the purpose of securing certain technical consulting services (the "**Datum Consulting Agreements**"), true

and correct copies of which are attached as Exhibits CONTRACTS:Glassey and Exhibits CONTRACTS:McNeil hereto.

56. The Datum Consulting Agreements were effective from May 4, 1998, to July 4, 1998, and during that period Plaintiffs provided services to Datum exclusively relating to market analysis to support Datum's developing e-commerce division.

57. Upon the expiration of the Datum Consulting Agreements, Plaintiffs and Datum agreed to continue to work together without further written agreements with the understanding, based on the existing Datum NDA, that Plaintiffs would own any and all intellectual property developed by them or shared by them during the term of the continuing relationship and that Plaintiffs would be independent contractors for Datum.

58. Among the tasks Plaintiffs agreed to take on as independent contractors for Datum after July 4, 1998, were the identification of potential acquisition targets for Datum as it sought to expand its e-commerce business.

**HISTORY: Plaintiffs' Relationship With DDI**

59. From approximately December 1997 onward, Plaintiffs worked to develop other relationships in the industry for the purpose of commercializing their time control technologies.

60. One of the companies that Plaintiffs developed a relationship with was Digital Delivery Inc ("DDI"). Glassey and DDI President Mark Hastings were talking about adding some timing controls to DDI's product suites and so then entered into a Non-Disclosure Agreement (Jun 1997) to further those discussions.

61. Later but under the NDA Glassey disclosed the scope and design of his GeoLocation Controls and Location Based Policy Services to Hastings as his new patent

application; This conversation took place in the employee second floor lounge at Westlaw Main with Westlaw Employee Ruven Schwartz Esq and Datum VP Mitch Stone present. Hastings had accompanied Glassey and Stone to Westlaw to discuss time services and Glassey's Trusted Timing Infrastructure with them as a product potential.

62. Hastings was excited about the idea of using secure time and location information (physical, logical or virtual) as a control aspect of a policy switch. This can be used for many other key applications as well so he became very aggressive with Glassey about getting these 'new features' patent protected and added to Confidential Courier at all costs.

63. One weekend in later August of 1997 Glassey was approached by DDI president Mark Hastings about his (Hastings) acting as Glassey's Patent Agent for the filing of the location based service patent. Glassey initially didnt trust the situation and because Hastings was formally represented by Richards and Fish and they would be representing Glassey before the PTO through Hastings it seemed believable.

64. There were numerous discussions between Glassey and Hastings about this including one key one where it was finally agreed that "with Richards and Fish as counsel of record that Hastings could represent Glassey before the PTO".

65. Under the NDA between Glassey and Hastings, the Plaintiffs turned over the initial Intellectual Properties to the Agent (Hastings and DDI) for the creation of the filing documents for the USPTO;

66. At this Time DDI president Mark Hastings and his counsel from Richards and Fish approached Glassey with a new plan. The "new plan" was that rather than Hastings filing a new patent for Glassey which he would sublicense from Glassey he

would file an amendment to the one he already had and Glassey would share the enforcement rights against its IP through a subsidiary agreement;

67. This was a 100% reversal of the roles under which the original agreement was consummated. Because of this Glassey again was very uncomfortable about and said no initially; it was only after a number of further conversations and Glassey's being assured by Richards and Fish ***the patent would issue quickly*** Glassey agreed.

68. Thus the amended instance of the Hastings "Confidential Courier" patent ('"992") was filed in 1998; Everything was fine initially although Glassey and McNeil were concerned about how little of the original ((2 technology one could identify in the filing but it was early in the process and the initial Examination was a year away or so Glassey was told so we just waited.

69. As part of his work with Datum Glassey had introduced Hastings to Datum formally; In early 1999 things changed.

70. Hastings immediately stopped answering questions about the patent's filing and in July in violation of the Co-Inventor "E Assignability Section Hastings reassigned the patent to Datum and sold them Digital Delivery Inc taking a job replacing the then incumbent president of the BANCOM Division of Datum where Glassey's work was done.

71. As to how he did that when Richards and Fish filed the patent originally they omitted the agreement which said the assignment was only valid for one year (in the Co-Inventor Agreement) from the filing and improperly filed it as ASSIGNED instead of CONDITIONALLY ASSIGNED. This allowed Hastings to sign on the reassignment without Plaintiffs Signature. This was corrected with the attached EXHIBITS: PTO-Correction-to-629 (USPTO correction to original filing status).

72. Thus the Federal Record for the original filing was finally corrected on August 6th 2013 to reflect the original assignment as conditional;

Glassey's sole purpose for retaining DDI was to get a low cost guaranteed filing in half a dozen jurisdictions and to get the patents issued as soon as possible. The new amended instance of the original DDI patent was to be filed with U.S. Office and the foreign instances agreed upon later (Brazil, EU, Japan, Canada, and South African) as the **Controlling Access Patent** and DDI and Plaintiffs sought to formalize an agreement which would allow for the most prompt filing of the application for the Controlling Access Patent.

**HISTORY: The 1998 Pre-paid Legal Services Contract ("The Co-Inventor Agreement")**

73. To enable this global patent filing activity effective on or about October 26, 1998, Plaintiffs and DDI entered into a "pre-paid legal services" agreement known as the **Co-Inventor Agreement**, a copy of which is attached hereto as Exhibit:Co-Inventor-Agreement.

74. The Co-Inventor Agreement retains Hastings and his company Digital Delivery Inc of Massachusetts ("DDI") to act as Plaintiffs' Patent Agent with full legal control and power of attorney relative to the limited area of patent filings.

75. According to Recital D of the Co-Inventor Agreement, its purpose was:

> [T]o allow the Controlling Access Patent application to be submitted as early as possible and prior to a definitive agreement between the parties with respect to each party's rights to exploit the Controlling Access Patent, the respective mutual and exclusive rights to the underlying or derivative technology, methodology, or other patentable subject matter contained or referenced in the Controlling Access Patent, and the compensation to be paid by

Digital to Glassey-McNeil for assignment of certain rights therein to Digital.

76. Recital A of the Co-Inventor Agreement commemorated DDI's ownership of the Confidential Courier product and its underlying patent ('992 patent). This is very important when considering how much of the underlying intellectual property from the original patent went into the filing or amendments to US6370629, a number which approaches zero in retrospect, meaning all of US6370629 is in fact PHASE-II technology;

77. Paragraph 1.C. of the Co-Inventor Agreement commemorated that Plaintiffs developed and provided to the Controlling Access Patent application geolocation Controls and Location Based Services known as "**Phase II**" a Term of Art meaning a system providing both physical location information but also very accurate time with phase matching data for aligning cryptographic heartbeats across a network or distributed framework. One very powerful source (though only a single example) of providing such time and location data is obviously the US Governments GPS sources.

78. Thus "Phase-II" technologies provides for a new level of authentication over the basic services Hastings had built into his existing patent. From the data model perspective Phase-II technology represents an authentication schema concurrent with industry standards in cryptography[3]

79. Paragraph 2.A. of the Co-Inventor Agreement provided further that, "[DDI] acknowledges that the Phase II technology is solely and exclusively the idea and invention of [Plaintiffs]."

---

[3] as an example we list one Phase II authentication schema description - "a cryptographic signing and verification process with the transmittal of time and geographic positioning information that allows a legally indemnifiable degree of trust to be established in the time and geographic positioning information thus conveyed." but there are a number of others as well.

80. The Co-Inventor Agreement was designed to be a work-in-progress agreement and was to be replaced in form by a larger agreement. One which codified Plaintiffs' rights to the IP and their third party enforcement rights (any and all uses) for the IP that they purchased the pre-paid legal services for.

81. The Co-Inventor Agreement explicitly contemplated that a future "definitive" agreement would be entered among the parties concerning the compensation to be paid to Plaintiffs as well as the parties' mutual and exclusive rights to the Controlling Access Patent within 365 days of the signing. At that time the Provisional Access and use Rights to both the original filing and Hastings' 992 patent became open.

82. Finally the last possibility documented in the Co-Inventor Agreement was a total failing on Hastings' part where both patents revert to shared by Plaintiffs as the superior rights holder in third-party enforcement of the patent-protected IP.

83. Two days after the Co-Inventor Agreement was executed, on October 29, 1998, the Controlling Access Patent Application (the "**1998 Patent Application**") was filed with the US Patent and Trademark Office ("USPTO"), a copy of which is attached as Exhibits:629-as-authorized hereto and in it McNeil and Hastings and his partner were added to the patent filing so the final title includes all four parties, Glassey as the principal inventor, McNeil as Glassey's senior Engineering Specialist, and Hastings and Willets for their work in the previous patent. As it happens though Willets was never on the original patent and as such shouldn't have been on the final filing as well. This then is allegedly yet another misrepresentation from Hastings in the filing of US6370629.

**<u>HISTORY:</u> <u>DATUM purchase of DDI violated the DDI/Glassey Contract "no transfer" terms</u>**

84. In violation of the IP transfer provision of the Co-Inventor Agreement Datum and DDI consummated a merger on or about July 29, 1999, whereby DDI became a wholly owned subsidiary of Datum upon which merger Datum became the successor-in-interest to all of the rights and responsibilities contemplated by the Co-Inventor Agreement. As such Datum became the Fiduciary although Glassey and McNeil were both very dissatisfied with the situation.

85. Section Five (5) of the Co-Inventor Agreement protects the Role of Fiduciary in what was called the Non-Assignability Clause; which was violated by Defendants and documented in their July 8K (Exhibits: CONTRACTS:CO-Inventor Agreement) report to the Securities and Exchange Commission of the Department of the Treasury, US Government. The section is excerpted here for reference. The reference is split across both Page 4 and Page five (5) continues with the text of section 5.

What it clearly says is ***that the Patent Ownership and the Role of the Patent Agent & Fiduciary here 'may not be assigned to any third party for any reason without a release from Plaintiffs'"***.

5. NONASSIGNABILITY

4

Digital Patent Contract

> The parties hereto have entered into this agreement in contemplation of personal performance hereof by each other and intend that the rights granted and obligations imposed hereunder not be extended to other entities without the other party's express written consent, except that Glassey-McNeil may transfer their interests herein to a corporation whose majority of voting shares are owned and controlled by them. This Agreement shall be binding and shall inure to the benefit of the parties and to their heirs, successors, and assigns.

No such release was ever asked for, contemplated by Plaintiffs or executed, and Datum's solution was simply to immediately attack its new "client" and sue GMT/Glassey and McNeil as individuals and withhold operating funds it as GMT's sole customer at the time owed the company to force an extorted settlement as reported in this complaint.

**<u>HISTORY: Robinson Letter</u>**

86. Immediately after the prohibited purchase of Digital Delivery Inc,. Datum Corp fired Bancom Division President David Robinson (see Notice Letter Exhibits:ROBINSON LETTER were Robinson declares formally "Datum doesn't want your IP" letter from Robinson) and replaced him with Defendant "Hastings" (Mark Hastings).

**<u>HISTORY: The 1999 Settlements which Plaintiffs allege "were extorted from Plaintiffs"</u>**

87. In addition to Hastings coming on board as an officer of Datum two weeks later in August 1999 Datum without warning filed a lawsuit against Glassey and McNeil ("the dispute");

88. Datum, we allege "also as part of this 'covert plan to bankrupt and steal GMT's assets'" did fabricate claims and filed a California Superior Court Lawsuit against GMT and Glassey and McNeil as individuals; and we assert in doing so violated its role as the Fiduciary which it had to accept to move the patent to it as the "acquiring of any fiduciary responsibility contract" in the US requires;

89. this set of actions were a part of an Overall Plan we assert was created inside Datum by CEO Erik Van Der Kaay and furthered directly by officers of Datum and the Successors Symmetricom and Microsemi both.

90. As part of its manipulating GMT into being forced to accept its terms for settlement Datum froze all payments outstanding to Glassey and McNeil after they had just had Glassey expend significant amounts of personal money developing "designed market analysis and other marketing materials for them". The net effect was they as GMT's sole customer at the time functionally drove GMT into insolvency to extort the two settlement documents; as such they manipulated GMT and both Glassey and McNeil personally to the edge of bankruptcy to extort the two settlement documents, both of which they furthermore allegedly breached;

91. Further because these denial-of-rights actions are still being performed today in the new successor to the Contract, by their refusing to accept the role per the terms of the contract for its transfer to a successor of Symmetricom, they have become as culpable for the Damages as Van Der Kaay and Mark Hastings are for creating them in the first place.

92. Through this set of alleged set of actions by DATUM and Hastings/DDI , and with what turned out to be very bad legal advice from GMT-counsel Jason Book Esq, both Glassey and McNeil were "financially manipulated and coerced into accepting

the settlements that Datum Counsel John Cannon drafted, as such Datum was the sole architect of the forms and their contents in the two settlement documents".

In all instances Book esq. advised Glassey and McNeil that they had no rights and would need to take whatever settlement and scraps Datum was willing to throw to us.

**HISTORY: Both Settlement Documents look almost identical**

93. John Cannon Esq, Datum's attorney at that time created two settlement documents for this matter. One Settlement for Digital Delivery Inc and a second for the Consulting Work and the IP under it which is the subject of US Patent 6393126 called the TTI Settlement.

94. Both documents used the same template and numbering forms and were drafted by John Cannon Esq of Stadling Locca in Newport Beach California. Hence sections 8.x of the TTI settlement are almost identical to those in the DDI settlement.

**HISTORY: 1st Settlement - Controlling Access (DDI Patent Agent services) Settlement**

95. The two separate settlement agreements were simultaneously signed in late November 1999, one of which is at issue in this section of the lawsuit and is the so-called **Controlling Access Settlement** also known as the **DDI Patent Rights Settlement/management agreement**, a copy of which is attached as Exhibits:CONTRACTS-DDI-Settlement.

96. The Controlling Access Settlement is the specific document the Co-Inventor Agreement says will replace it in regard to its patent filing efforts.

**HISTORY: 2nd Settlement - Trusted Timing Infrastructure (tti) Settlement**

The second settlement, the TTI Settlement, is patterned after the first (DDI) settlement as was intended to cover the uses of the limited parts of the Glassey TTI service infrastructure that were the topic of the Settlement itself.

**HISTORY: DDI Settlement Breach**

97. The Controlling Access Settlement was intended as a cap or umbrella for other documents necessary to complete the deal and properly control the patents and the roles for both parties, but served as the "definitive" agreement between Plaintiffs and Datum concerning the initial compensation to be paid to Plaintiffs; it is very clear about who owns which scope of technology but Plaintiffs would have to wait to see in what form the final patent was issued. It is fully contemplated in 1998 by the Co-Inventor Agreement.

98. Paragraph 2.2 of the Controlling Access Settlement defined the "Controlling Access Patent" for purposes of that agreement to include the 1998 Patent Application as well as foreign patents pending Filing Services under the Fiduciary Role for the Patent Filing Agent herein.

99. Paragraph 2.3 of the Controlling Access Settlement defined "**Phase II Technology**" as:

> The method of authentication, encryption and transmission of date/time and/or location data for the purpose of linking together two or more disparate electronic components, such that a trust model is established between them. Such physical elements must individually be capable of computational and cryptographic functionality, but computationally may be isolated from one another. Such electronic components must be physically secure, and communicate with each other over communications channel(s) which may themselves be insecure.

100. Phase II Technology included, and expanded, the technology identified as GPS Phase II technology which had been identified as the property of Plaintiffs in the Co-Inventor Agreement.

101. Pursuant to Paragraph 3.2 of the Controlling Access Settlement, Plaintiffs assigned "all rights, title, and interest" in the 1998 Patent Application and foreign patents based thereon to Datum.

102. However, Datum explicitly agreed in Paragraph 3.3 of the Controlling Access Settlement that Plaintiffs, "own[] all rights, title and interest in the Phase II Technology".

103. Paragraph 3.3 of the Controlling Access Settlement granted Datum a "perpetual, non-exclusive, irrevocable, assignable, sub-licensable, worldwide license for use of the Phase II Technology and derivatives thereof, with rights to sublicense, in connection with the limited scope of the DDI Confidential Courier product and its derivatives".

104. According to the foregoing provisions of the Controlling Access Settlement, Plaintiffs had exclusive rights, title, and interest to Phase II Technology, anywhere in the world, except for the limited rights which Datum had to use that Phase II Technology which was identified in the 1998 Patent Application.

105. Also according to the foregoing provisions of the Controlling Access Settlement which granted all ownership rights in Phase II Technology to Plaintiffs, subject to Datum's license, Datum had an obligation to protect and maintain any and all patents relating to Phase II Technology to which it was assignee.

106. Paragraph 3.6 of the Controlling Access Settlement further clarified the parties' intent that Plaintiffs would continue to have the right to commercialize Phase II Technology.

107. Specifically, Paragraph 3.6 memorialized that Plaintiffs agreed not to, "make, use, or sell any products developed using or derived from the Phase II Technology which also include the technology described in or covered by [Datum's existing Confidential Courier patent]" which under the terms of the original Co-Inventor Agreement was not jointly owned by both DDI and Plaintiffs in the agreement.

108. The above clarifies that Plaintiffs retained all rights to make, use, and sell new "Phase II" Technology which did not also include the technology described in or encompassed by the patent covering the Confidential Courier product; but since that patent (the '992 Patent) had already transited to a shared resource this provision of the settlement was found to be moot and unenforceable.

109. As of the effective date of the Controlling Access Settlement, the 1998 Application had been pending at the US Patent and Trademark Office ("PTO") unchanged from its October 28, 1998, filing date.

**HISTORY: The 2001 Controlling Access Patent Application Expansion**

110. After the parties executed the Controlling Access Settlement, Datum continued the prosecution of the Controlling Access Patent but ran into disapproval of the original expansion of Hastings' existing patent which was never communicated to Plaintiffs as required under section 8.7 of the Controlling Access Settlement.

111. At no time following the execution of the Controlling Access Settlement were Plaintiffs allowed to be involved in the prosecution of the Controlling Access Patent.

112. At no time following the execution of the Controlling Access Settlement did Datum ever attempt to include Plaintiffs in the prosecution of the Controlling Access Patent or advise them of the status of that prosecution.

113. Following a rejection of the developing application for the Controlling Access Patent once for anticipation and again for obviousness, Hastings under his role as the Bancom Division President at Datum radically expanded the amount of Phase II Technology in the independent claims pursued in the Controlling Access Patent application in its response to office action dated August 20, 2001 (the "**2001 Patent Application Rewrite**"), a copy of which is attached as EXHIBITS:2001-REWRITE hereto.

114. Plaintiffs did not discover the scope and effect of the 2001 Patent Application Rewrite until 2013.

115. As a result of the 2001 Patent Application Rewrite, each of the independent claims Datum pursued in its application for the Controlling Access Patent included vastly more of Plaintiffs' Phase II Technology than they had ever agreed to license to Datum in the Controlling Access Settlement. This change is detailed in the declaration pertaining to unauthorized changes in the Patent which is attached as EXHIBITS:Patents-2001-rewrite hereto.

116. The consequence of Datum's radical expansion of the amount of Phase II Technology in the 2001 Patent Application Rewrite was twofold: first, it was sufficient to convince the PTO to grant a notice of allowance of the application and paved the way

for issuance of the patent; and second, it had the effect of subsuming what remained of Plaintiffs' Phase II Technology into the issued Controlling Access Patent and foreclosed them from seeking that patent themselves.

117. The Controlling Access Patent ultimately issued as US Patent No. 6,370,629 (the "'**629 Patent**") on April 9, 2002, a copy of which is attached as EXHIBITS:Conformed-Copy hereto.

118. The '629 Patent will be in effect until October 29, 2018.

119. The claims in the 2001 Application Rewrite numbered 12, 18, 21, 25, and 29 were issued verbatim as claims 11, 16, 19, 23, and 27 (respectively) in the '629 Patent.

120. The 629 Patent contained a significant amount of Phase II Technology which Symmetricom had never compensated Plaintiffs for and which Plaintiffs had free reign to license to third parties.

121. Datum, and on information and belief later Symmetricom, prosecuted similar patents to the '629 Patent in other jurisdictions around the world.

**HISTORY: Symmetricom's Repudiation Of Plaintiffs' Rights To Phase II Technology**

122. In the years following the issuance of the '629 Patent, Plaintiffs attempted to license their Phase II Technology, as embodied in the '629 Patent, to various third parties.

123. Datum (hereafter referred to interchangeably with its parent Symmetricom) interfered with Plaintiffs' attempts to do so by refusing to acknowledge the existence or validity of the Controlling Access Settlement until it produced a countersigned copy for the first time in February 2013.

124. On information and belief, Symmetricom further interfered with Plaintiffs' attempts to license their Phase II Technology by refusing to produce a countersigned copy of the Controlling Access Settlement to Plaintiffs, including refusing to do so in connection with the civil suits relating to the Controlling Access Settlement pending in California Superior Court since 2009 up until the foregoing February 2013 date.

125. These included their actions within the Global Standards Agency called the IETF (Internet Engineering Task Force) who was actively using the infringing IP inside of the systems they were publishing their standards upon as well as including the same infringing IP in the very standards themselves.

126. On information and belief, Symmetricom allowed foreign patents which covered Plaintiffs' Phase II Technology to lapse or become abandoned, despite having the duty to maintain those patents and having knowledge that Plaintiffs relied on them to do so. This constitutes a simple SHERMAN Act event and is clearly an Antitrust action.

**COUNT ONE**
**(Breach of Controlling Access Settlement by 2001 Patent Application Rewrite)**

127. Plaintiffs restate the above as if set out in full herein.

128. In 1999, Plaintiffs and Microsemi entered into the Controlling Access Settlement by which they contracted for Microsemi's license to the portion of Plaintiffs' Phase II Technology which was embodied in the 1998 Patent Application and which was incorporated in Microsemi's Confidential Courier .and its derivatives product line.

129. The Controlling Access Settlement is still in force and serves as the basis for Microsemi's continuing claim to be the assignee of the '629 Patent.

130. In 2001 Microsemi breached the Controlling Access Settlement, and its license to Phase-II Technology embodied therein, with its 2001 Application Rewrite to the USPTO, which resulted in the '629 Patent containing claims which read on portions of Plaintiffs' Phase II Technology never contemplated to be so-included by the parties to the Controlling Access Settlement and never licensed by Plaintiffs to Microsemi.

131. As a result of Microsemi's breach of the Controlling Access Settlement, Plaintiffs have been damaged in the amount of licenses they could have received from the Phase II Technology described in the 2001 Application Rewrite, their expectancy therefrom, and/or their lost profits from the 2002 issue date of the '629 through the life of the '629 Patent which will not expire until 2018.

**COUNT TWO**
**(Breach of Controlling Access Settlement For Failure to Protect Phase-II IP)**

132. Plaintiffs restate the above as if set out fully herein.

133. The Controlling Access Settlement contemplated that certain portions of Plaintiffs' Phase II Technology would fall within the claims of Controlling Access Patent and that Microsemi would serve as assignee of that patent.

134. The Controlling Access Settlement also commemorated the fact that Plaintiffs were the sole owners of all Phase-II Technology.

135. As assignee to that Phase-II Technology which fell within the Controlling Access Patent, Microsemi had a duty to protect and maintain all such Phase-II Technology, including, without limitation, maintaining all domestic and foreign patent rights thereto.

136. Microsemi (predecessor) had fulfilled that when in writing it asked Plaintiffs for the patent filing release for South Africa; and in fact threatened litigation if it was not produced for both-parties' use in a timely manner (two calendar weeks). No other releases (for the EU, CA, BR, or JP filings) were requested and as such there is a claim under the Sherman Act based therein here for Antitrust as the Fiduciary operating in a Foreign Nation, and under the Foreign Antitrust Act's very stringent "connection to commerce in the US" these filings, as foreign instances of US6370629 and the related unauthorized filings of US6393126, bring this all together under the Sherman Act under its horizontal customer allocation and territorial allocation agreements, something the Defendants acted in preventing the advancement of each of the foreign filings of US6370629 as well as the foreign unauthorized filings of US6393126 entail.

137. Microsemi has breached its duty to maintain the Phase-II intellectual property by allowing certain foreign patents covering Plaintiffs' Phase-II Technology to lapse.

138. As a result of Microsemi's breach of its duty to maintain the patents covering the Phase-II Technology, Plaintiffs have been damaged in an amount to be determined at trial by the global inclusion of this protected IP into Internet and Networking standards. As a result of this the entire world has become an infringer into this IP and its controls.

**COUNT THREE**
**(Unjust Enrichment - Microsemi)**

139. Plaintiffs restate the above as if set out fully herein.

140. In 1999, Plaintiffs and Microsemi entered into the Controlling Access Settlement by which they contracted for Microsemi's license to the portion of Plaintiffs' Phase II Technology which was embodied in the 1998 Patent Application.

141. In 2001 Microsemi submitted the 2001 Application Rewrite to the USPTO, which resulted in the '629 Patent issuing containing claims which read on Phase II Technology never contemplated by the parties to the Controlling Access Settlement and never licensed to Microsemi by Plaintiffs.

142. As a result of Microsemi's unilateral and unlawful expansion of the scope of the Controlling Access Patent, and its status as assignee of that patent, Microsemi has been unjustly enriched in the amount that it has benefitted in any way from the Phase-II Technology not included in the 1998 Patent Application.

**COUNT FOUR**
**(Tortuous Interference With Prospective Economic Advantage - Microsemi)**

143. Plaintiffs restate the above as if set out fully herein.

144. Plaintiffs are the sole owners of Phase-II Technology with the limited exceptions of Microsemi's license rights as delineated in the Controlling Access Settlement.

145. Microsemi, as the counterparty to the Controlling Access Settlement, had actual knowledge of Plaintiffs' rights to all Phase-II Technology, subject to its limited license rights.

146. After issuance of the '629 Patent, Plaintiffs attempted to license rights to their Phase-II Technology with prospective licensees.

147. On information and belief, Microsemi directly interfered with Plaintiffs' attempts to obtain economic advantage from their Phase II Technology by advising prospective licensees that Plaintiffs had no rights to any of the property embodied in the '629 Patent, including all Phase-II Technology therein.

148. Microsemi likewise repudiated the existence of the Controlling Access Settlement to Plaintiffs and to third parties by, among other things, for thirteen (13) years refusing to produce a fully-executed copy of that agreement (until February of 2013).

149. Microsemi's direct and indirect actions were wrongful and done with the intent to deprive Plaintiffs of their business expectancy with prospective licensees.

150. As a result of Microsemi's tortuous interference with their prospective license arrangements, Plaintiffs have been damaged in an amount to be determined at trial.

**COUNT FIVE**
**(Declaratory Judgment – '629 Patent Contains Phase II Technology Not Within 1998 Patent Application)**

151. Plaintiffs restate the above as if set out fully herein.

152. There is an actual controversy as to whether and to what extent the unlicensed 2001 Application Rewrite for the '629 patent filing and the final '629 Patent contain Phase-II Technology which was not contemplated by, or incorporated into, the 1998 Patent Application or the Controlling Access Settlement.

153. This exposure of trade secret and NDA protected information in the US6370629 patent filing constituted first-use inside the Patent Program and prevented Plaintiffs from filing their own patents on the same material.

154. In regard to this claim Plaintiffs request the Court enter a declaratory judgment based upon its construction of the claims of the 2001 Application Rewrite and the '629 Patent and using its comparison of them with those in the 1998 Patent Application to delineate with specificity the components of the claims of the 2001 Application Rewrite and the '629 Patent which read on Phase II Technology and are not contained in the 1998 Patent Application.

155. The purpose of this is to determine whether there is any relevant part of the original patent as a part of '629 or whether it is all content pertaining to the Phase-II IP designs and as such the entire patent is Plaintiff's property based on a allegation of a discovered fraud in the original filing wherein "there isn't any of the IP in the final patent which the Defendants assured Plaintiff's they were contributing to the US6370629 filing", something that would eliminate any of the underlying reasons for the original assignment to Hastings and his company DDI in the beginning of this matter.

156. If it is determined that there is none of the underlying Intellectual Properties from the '992 Patent inside of '629, then the Court is asked to order the immediate 'voiding' of both the Assignment for Management Agreement and the Settlement Agreement therein.

**COUNT SIX**
**(Tortuous Interference With Prospective Economic Advantage - Sherman Act/Antitrust)**

157. Plaintiffs restate the above as if set out fully herein.

158. Plaintiffs are the sole owners of Phase-II Technology with the limited exceptions of Microsemi's license rights as delineated in the Controlling Access Settlement.

159. Defendants have a formal responsibility to protect the IP described in the Settlements it controls for all parties. That specifically includes making sure the patents are viable and unauthorized users are not using the IP or authorizing Copyrightable Standards or Code implementing these standardized functions which will infringe on Plaintiffs rights.

160. As such Count Six involves Defendant IETF, the Internet Engineering Task Force and its parent organization the Internet Society (ISOC) for their use of PHASE-II protected IP in many of their standards and now inside of the core drivers which make up the foundation of the World's Internet.

161. Microsemi's through its incarnations over the last decade and their direct and indirect actions in its working with the Defendant IETF are a key part of their tortuous interference.

162. In its interfering with Plaintiffs rights, Microsemi refused to confirm the US 6370629 controlled third-party enforcement rights to Defendant IETF which Plaintiff's enjoyed per the settlement and in doing so (actively participating in the standards process) they defrauded Plaintiff's by placing an IETF controlled copyright onto Plaintiffs Intellectual Property as part of the standards practice by allowing IETF to use Plaintiffs IP in the systems the standards are and were drafted on.

163. As to how these are Sherman Act violations, these actions with the IETF constituted market division or allocation schemes to prevent Plaintiffs from being able to

enforce their rights herein and to enforce a global monopoly against the enforcement of US6370629 in all nations.

164. In addition to its performing this process, the IETF operates its entire existence across a number of computers in a distributed network; In its doing this the IETF has used the infringing IP products themselves inside its very operations in all of its publications; additionally it has included instructions which force a third-party implementing compliance with their design-set to infringe as well meaning anyone implementing the standard as a product would infringe as well as their customers;

165. Historically this was done by IETF with its partner Microsemi and US Government in numerous of its standards despite continuous objection from Glassey over its unauthorized use and the fact the Standards Org as a Consensus based standards organization isn't doing research and cannot claim its doing anything other than IP development for commercial users, and as such has no research exemption.

166. Finally a question arises as to the "the Use of Copyright ss107 exemptions to cover-up patent infringements by 'the party proselytizing the intentional infringement' by forcing its use in their very work product the Internet Protocol 'standards documents'"; and

167. As the second half of this same question, the allegation is that the IETF itself is not a transparent standards process at all and is not comparable or have any real oversight like ANSI or the IEEE and that as such it has become more of the Wild West Show the JEDEC standards committee was found in the US Courts to be in the RAMBUS Matters.

**IETF Copyright ss107 Status and MGM v Grokster Standings**

168. Additionally as part of Count Six the Court is asked to rule formally on whether the IETF itself is a Research Organization under the Copyright 107 exemption. The purpose of this is to make a determination as to whether the IETF's actions constitute something farther than copyright frauds under MGM v Grokster. The Supreme Court ruling in MGM Studios Inc v Grokster Ltd set a standard for any party (in this case the IETF a global standards agency operated as a ***benevolent fraternal org*** under the Tax Exempt Umbrella of the Internet Society Corporate Standing we assert "to cover up its real purpose, to allow Silicon Valley companies and others to manipulate global IP standards in their desire to end all patent support in any technology venue".

169. As such they (the IETF) are identical to GROKSTER as an agency distributing IP controlled products under an external agreement and their actions fully controlled by the Supreme Court ruling therein. (see ***MGM Studios, Inc. v. Grokster, Ltd.***, 545 U.S. 913 (2005)[4]).

170. The argument being that the IETF is identical to a P2P sharing service and so is the Grokster-Role party in this matter and as such cannot even if they are a research institution (which is highly doubtful since they maintain the Internet Research Task Force (www.irtf.org), a separate org controlled under a separate set of rules and practices) still qualify as a 107-enabled entity as a University could.

171. As such the IETF publication of our their standards which contain our Patent-protected Technologies constitutes a both a direct infringement in the publication as well as an additional Copyright Infringement on the natural copyright

[4] 545 U.S. 913 (*more*) see also 125 S. Ct. 2764; 162 L. Ed. 2d 781; 2005 U.S. LEXIS 5212; 75 U.S.P.Q.2D (BNA) 1001; 33 Media L. Rep. 1865; 18 Fla. L. Weekly Fed. S 547

issued when the US Government issued the US patent controlling this material. That second claim is tied to the actual copyright and the IETF's failure to enforce any of its Intellectual Property process ruled contained in BCP79, its IP Standards Document;

172. The principal claim is the IETF in refusing to enforce its own rules and practices and in not being a research institute or academic practice, and finally under its blanket use of the infringing technology in its own infrastructure creates a natural-trifecta of claims which exist under a number of standards from the Sherman Act to theft of Trade Secrets and in the intentional damage to the IP in the abandonment's of the patents filed in the EU, South Africa, Japan, Brazil, and Canada all support this fully, that under Patent and US IP and Trade Secret Law, no extension of the ***research exemption under the copyright provision*** exists for the IETF, and further Copyright Exemptions cannot authorized the setting aside of US Patent Law under Title 35 so the IETF creating a written work about a technology cannot "in and of itself carry any right to implement, use or do anything else with that Patent Protected IP, only Patent Licensing satisfies that.

**COUNT SEVEN**
**(Declaratory Judgment – Patent Fraud, Unauthorized Filing of US6393126)**

173. Plaintiffs restate the above as if set out fully herein.

174. Plaintiffs are the sole owners of Trusted Timing Infrastructure (TTI) System Technology with the limited provisions of the three derivatives licensed to Microsemi against three of the thirty-two components of the TTI itself.

175. Further that these are licensed for US use only in the Settlement Agreement since sections 8.1 and 8.3 restrict any and all disputes with the products or

their use by any and all third parties including end users to the Courts and Laws of the State of California.

176. Microsemi as predecessor Datum filed a patent against "the entire Trusted Timing Infrastructure IP library" listing Erik Van Der Kaay (US6393126) as the inventor with several of his engineers including those directly involved in the alleged "standards agency frauds" outlined previously in COUNT SIX.

177. The Patent (US6393126) was issued in the US and in a number of other countries and contains a number of controls and claims which overlap those which the US6370629 patent was filed to protect, so the foreign instances of 6393126 control many aspects that the Plaintiffs' rights under US6370629 which were filed in those same nations were intended to. As such the promulgation of 6393126 into foreign filings is an alleged fraud done to control key aspects of what the US6370629 is supposed to.

178. Nothing in the Trusted Timing Infrastructure settlement contemplated Microsemi filing a patent listing itself as the creator of the technology, something blatantly false based on the settlement agreement alone. This claim is further fully supported by the Toby Gellman appellate ruling.

179. The amount of the TTI which the patent was issued against like the 2001 changes to '629 included large amounts of Glassey owned IP from the CertifiedTime Inc Bankruptcy (01-54207-MM - San Jose). Additionally aspects and IP controlled by '629 was added to the '3126 patent without authorization to get it issued as well.

180. We therefore seek an order to the USPTO to remove Erik Van Der Kaay's name from this patent as well as the others and to replace them with Plaintiff Glassey exclusively. Likewise there is no assignment of this patent to Microsemi corporation

planned for or authorized in the settlement so we ask the Court to order the Patent Office to reassign this patent with full rights therein to Plaintiffs;

**COUNT EIGHT**
**(Declaratory Judgment –International transfer of TTI Intellectual Properties to set aside the Settlement Agreement, Unauthorized removal of TTI from US Courts' Jurisdiction)**

181. Plaintiffs restate the above as if set out fully herein.

182. Plaintiffs are the sole owners of Trusted Timing System Technology with the limited provisions of the three components licensed for US use only in the Settlement Agreement.

183. Settlement Terms are permanent per section 3.15 and 8.4 of the DDI Settlement contract and require continuous reporting on licensing, and further per sections 8.1 that "any and all disputes for any and all users of the IP sublicensed in the settlement do so in the courts and under the laws of the State of California" and that per section 8.3 these terms are binding on all successors in any form (including but not limited to end-users of the product and any intermediary distribution framework set up to support them).

184. Microsemi corp. at some point entered into a Joint Venture with a Cambridge England company called nCipher based on an introduction Plaintiff Glassey had made several years previous.

Microsemi transferred the protected IP of the TTI settlement to nCipher who took it to England and then brought the product back into the US as an English Copyright and Patent based Product under their name. This violated the terms of the settlement agreement.

**COUNT NINE**
**(Declaratory Judgment –Mandatory Acceptance Requirements for transfer of US6370629 to Microsemi)**

185. Plaintiffs restate the above as if set out fully herein.

186. Per section 8.4 each party assuming a control role for the licensing must notify the Plaintiffs of this within the 14 day period agreed to between Microsemi Attorney John Cannon and Plaintiffs as documented in the Cannon South African Patent Instance filing release letter.

187. Plaintiffs request the court issue a declaratory judgment that Microsemi breached this key term and strip Microsemi of the US6370629 patent awarding it in full to Plaintiffs and damages therein as the court sees fit including fraud losses therein.

**COUNT TEN**
**(Declaratory Judgment –Defendant US Government's use of FISA and National Security Letters to cover up other actions and alleged frauds)**

**Governments Alleged Use of a National Security Letter in this matter**

188. Plaintiffs assert that this matter clearly has National Security implications because this single set of IP rights controls all systems inside the Government as well all commerce in the US today; and based on various refusals from the US DoJ and the giving of a Judges position to Defendant PETER CHEN the specific attorney inside the Lathem Watkins law firm we believe created the delaying tactic and withholding-the-settlement agreement from everyone, the Plaintiffs believe that the President of the United States (POTUS) or some party working for the President issued a National Security Letter (NSL) to the FISA Court and "that a warrant classifying this fraud loss and the actions of both the Government Employees and those of the Industry Players

herein" was issued in this matter to prevent Glassey and McNeil from getting proper legal help in advancing these fraud claims, and as such this becomes a key civil rights matter therein. That said letter may have even been served on California Judiciary including the Judge in California who dismissed the review of the original contracts and alleged frauds therein while continuing to operate the courts infrastructure on infringing technology as well.

189. This claim is substantiated by every attorney hired by Glassey to prosecute this matter "refusing to answer the question 'as to whether they were contacted by anyone in their State Bar, State Government, US Government or in particular the FISA court in this matter'".

190. As such we request the USDC and this Court immediately reach out to the FISA court and request formal verification of this matter and if said order exists issue a further order "vacating any rulings in this matter by any other court".

191. That the USDC also order the termination of that National Security Letter if it does exist;

192. The justification for this is that an Action denying Bill of Rights protections against Court Access and Property Protection violates all of the FISA Court Members Oath of Office as Judges of the US District Court and that an action on the part of the FISA Court itself constituted both interference with a private citizens Seventh ***Amendment access to competent legal services and the courts therein***, and through that ***a manipulation of the that citizens fifth amendment rights codified in the Settlement or Co-inventor Agreements both.***

193. Further this final claim includes Named DOES named as USG (US Government) and its former officers including Leon Panetta as an individual today, the

following US Government agencies: National Security Council and the President of the United State as an individual and in their respective roles in the US Government.

**Summary and Additional Prayer for Relief not included in Counts**

WHEREFORE, Plaintiffs Michael E. McNeil and Todd S. Glassey request this Court to enter judgment in their favor on all counts, especially count ten (10), and to award the Plaintiffs damages as requested in specific Counts and cumulative damages in an amount to be determined at trial against "the use of the unauthorized and patent-protected IP rights by IETF and all of its third-party Users as was done with MGM Studios v Grokster herein including in all computing and network infrastructure components (including but not limited to switches, routers, servers, and client platforms including cellular and mobile computing (aka wireless/cellular) systems)" in use globally through the entire effective period of all patents cumulatively including those abandoned today.

Additionally as part of this to

1. award Plaintiffs specific declaratory relief to the effect that the 2001 Application Rewrite and the '629 Patent contain Phase-II Technology which was not identified in the 1998 Patent Application,
2. award them relief in regard to their US3693126 damage claims, and
3. award the Plaintiffs damages against the US Government (POTUS, NSA, National Security Council, DoJ, et Al.) for their alleged use of a NSL and FISA warrant issued to GLASSEY Counsel's (from Hopkins Carley and Berliner Cohen to Mahaney/Ertl) for the effect of this 'classifying the fraud complaint under the FISA and National Security Act (as well as other

legislation) ***to reduce or eliminate the effectiveness of Plaintiff's Counsel in the matter herein***;

4. award Plaintiffs

   a. against the IETF and its parent the Internet Society uses in operating the computers they publish virtually everything on and through, as well as the key companies profiting from this as a class including but not limited to Cisco, Google, Apple, Ebay, Paypal, Oracle Microsoft, and

   b. additionally under current US Public Policy to issue formal Court Order to the IETF and Internet Society "that all of their standards must come into immediate conformance with US DMCA provisions and best practices of a Global Standards Org with regard to its IP Management Practices" - meaning there must be a DMCA compliant use and take down policy implemented in all existing IETF standards; and

   c. finally that this court order that the IETF Copyright of all preceding documents is void by this alleged fraud and that by order of the court "no matter what contractual agreement exists between the authors and the IETF as to that IP's licensing", and to award Plaintiffs any award to plaintiffs direct losses, treble damages as authorized by the numerous fraud statutes this suit alleges were violated and any other relief to which the Plaintiffs are entitled, including but not limited to legal fees herein.

d. Based also on the Equal Protection Clause of the Fourteenth Amendment and other aspects of the Fifth and Fourteenth Amendments the denial of both the US Government and the State of California has placed both entities in a position where they have not only violated the Fifth Amendment by allowing the conversion of the disputed properties, but in doing so they also under the fourth Amendment functionally seized property[5] by claiming this Intellectual Property Right against US and Foreign Patents did not exist, in doing so they have blocked access to the courts therein under the Seventh and Fourteenth Amendments to the US Constitution.

[5] Boyd v. United States, 116 U.S. 616 (1886)

Respectfully submitted,

Aug 20 -2014

**Todd S. Glassey, In Pro Se**

tglassey@earthlink.net

305 McGaffigan Mill Road
Boulder Creek CA 95006
Telephone: (408) 890-7321

8/20/2014

**Michael E. McNeil, In Pro Se**

Michael E. McNeil, In Pro Se
PO Box 640
Felton CA 95018-0640

**<u>Jury Demand</u>**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of all issues so triable.

Aug 20 2014

Plaintiffs

8/20/2014

Plaintiffs